| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK | | |
|---|---|---|
| JANE DOE, Plaintiff, -against- BARD COLLEGE, a Non-Profit Educational Institution, Defendants. | | Civil Action No.: 7:22-cv-7258 **COMPLAINT AND JURY DEMAND** |
| | | |

Plaintiff Jane Doe (hereinafter "Plaintiff Doe" or "Doe") by and through her attorneys, the Strategic Advocacy Clinic of Yale Law School, the Law Office of Avery Gilbert, and the California Civil Rights Law Group, states as her complaint against defendant Bard College (hereinafter "the College" or "Bard"), as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Jane Doe, a gay woman of color, received a doctoral degree in English and American Literature from Harvard University in 1998–the only Black woman to do so that year. In 2008, after a successful decade teaching at other institutions, she was hired by Bard College and, for the next dozen years, attempted to protect students and herself from an environment at Bard so racist that she could only describe it as a scenario from the racial horror film, "Get Out."

2.     This case lays bare how Bard operated for years to protect senior faculty and administrators accused of racial harassment and sexual predation, while fostering a hostile environment for people of color on its nearly all-white Annandale campus.

*Jane Doe v. Bard College*                                                    Civil Complaint

3.      Bard's racist conduct was egregious. Bard professors instructed her "not to think so much of herself," called her "arrogant," "feral," "high yellow sweetie," and unapologetically had her African American guests held at gunpoint by state police in the middle of the night.  In her 10 years of employment, she was denied promotions and kept in a "visiting" faculty position, against Bard's own policy, while lesser-qualified White employees were promoted. Plaintiff Doe was not allowed an electronic security lock on her department door like other Bard administrative offices despite the college knowing that she was being attacked for her race. Instead, the College investigated *her* for engaging students in difficult subjects of racial subjugation, telling students about racist attacks she had experienced in the town of Red Hook, where Bard is located, and for inviting artists to the Annandale campus, one of whom was Black, requiring her to prove the artists were not "dangerous."

4.      Plaintiff Doe was a sounding board and a place of refuge for students of color as they were frequently infantilized, discarded and discriminated against by other Bard faculty and administrators. For years, Plaintiff Doe alerted Bard senior faculty and administrators of the discriminatory treatment she and students of color experienced, and of the College's inaction in addressing students who bravely came forward with sexual assault and harassment allegations. Rather than lauding Plaintiff Doe's efforts to protect students, Bard retaliated against her by denying her promotions, undermining her career, refusing to protect her against a violent student, conducting a sham investigation against her that was itself an act of racial harassment, and ultimately terminating her employment.

5.      Plaintiff Doe seeks redress for these wrongs to force Bard to protect its students of color and faculty members who stand up for themselves and for victims' rights.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's federal law claims pursuant to pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because Plaintiff's claims arise under the laws of the United States, namely 42 U.S.C. § 1981 and 20 U.S.C. §1681.

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Plaintiff's claims arose in this district.

## PARTIES

9.      Plaintiff Doe holds a Ph.D. in English and American literature from Harvard University. She was hired by Bard in 2009 as Associate Dean of Students, Director of Multicultural Affairs, and Visiting Assistant Professor.

10.     Throughout her time at Bard College, Plaintiff Doe reported racial discrimination and workplace harassment directed at students of color, as well as her concerns that alleged sexual misconduct and professional misconduct by Bard administrators and faculty members were going unaddressed by the College.  In 2017, Plaintiff Doe reported to senior Bard administrators that the College was not fulfilling its duties under Title IX in the actions it took regarding a Black female student who alleged she had been raped on campus.

11.     Defendant Bard College ("the College" or "Bard") is a private, nonsectarian college located in Annandale-on-Hudson, New York. Upon information and belief, the College receives federal financial assistance.

*Jane Doe v. Bard College*                                    Civil Complaint

## FACTUAL ALLEGATIONS

### 1.    PLAINTIFF DOE'S QUALIFICATIONS AND BACKGROUND

12.    Plaintiff Doe's educational background is highly prestigious. She graduated from Wellesley College with honors in Comparative Literature in 1990, where she was a two-time winner of the Academy of American Poets Prize. She was a Mellon Fellow in Comparative Literature at Stanford University in 1990 and continued her Mellon Fellowship at Harvard University, where she was also a Graduate Prize Fellow. Plaintiff Doe received her Ph.D. from Harvard in 1998 and was a Pembroke Fellow at Brown University from 1998 to 1999.

13.    From 1999 to 2000, she was an Assistant Professor of English Literature in a tenure-track position at Skidmore College. From 2000 to 2001, she was a fellow at Oxford University, researching Feminism and Enlightenment. From Fall 2000 to Spring 2004, she was a tutor and fellow at Harvard University in the Departments of Literature and Special Concentrations.

14.    From 2005 to 2009, Plaintiff Doe was Assistant Professor of English on a tenure track at the City University of New York ("CUNY") where she received glowing teaching evaluations.

### 2.    BARD'S OPEN HOSTILITY TOWARD PEOPLE OF COLOR

#### i.    Bard President Warns Plaintiff Doe Of "Hostility" Toward Black People, Her Tenure Track Position Is Suddenly Rescinded When The Predominantly White Faculty Calls Her "Arrogant"

15.    In 2008, Plaintiff Doe, at the urging of her domestic partner at that time, Kim Barke, who lived close to Bard College, applied for a position at Bard College so that she could move from Brooklyn, New York and join her partner in Red Hook. During Plaintiff Doe's employment interview on September 15, 2008 with President Botstein, he noted the rampant racism at Bard, telling her directly that *"There's a tremendous amount of hostility toward Black people here at Bard."*

4

16.     President Botstein orally offered Plaintiff Doe a tenure-track faculty position in Literature as well as an administrative job as Dean of Multicultural Affairs and Associate Dean of Students.

17.     Bard College Dean, Michele Dominy, then told Plaintiff Doe that the tenure-track position was being withdrawn because the Literature Department faculty thought she was qualified but "arrogant." Plaintiff Doe was instead offered a non-tenure track role with lower pay, lower academic prestige, and heavier workload: Visiting Assistant Professor of Humanities, Director of Multicultural Affairs, and Associate Dean of Students.

18.     Plaintiff Doe, who already held a tenure-track faculty position within CUNY, was bewildered by this bait-and-switch. While she was still considering whether to counter-offer, continue to negotiate, or refuse the offer outright, Bard pre-emptively, before she had accepted the demoted position, announced Plaintiff Doe's hiring on their website, putting her in an untenable position with her then-employer. Michelle Harris, a human resources administrator at CUNY, confronted Plaintiff Doe, leaving her with little recourse but to accept the Bard position on the new, lesser terms offered.

19.     Her new supervisor at Bard, senior administrator Erin Cannan, warned her that "Black people don't stay at Bard" because Black people are "more urban" and would not "enjoy" the rural setting of Bard.

20.     Plaintiff Doe dutifully and ably performed her work. She invented the College's Difference and Media Project (DMP), which provided a space at Bard to educate the student body on issues of race, gender, sexual orientation and power, organizing more than 50 events per year. The Difference and Media Project was lauded by Bard as a "major institutional development" and considered a key part of its diversity work necessary to maintain its status as a credentialed

5

*Jane Doe v. Bard College*                                          Civil Complaint

academic institution. In addition to running the DMP, Plaintiff Doe taught First Year Seminar, an advanced, interdisciplinary seminar, titled "Race and the Pastoral," –designed in part as a response to the ignorant and racist comments made to her by senior administrator Ms. Erin Cannan and as an investigation of why the area around Bard was so lily-white– a graduate curatorial studies class, and dozens of other classes in Critical Theory, Gender Studies and Classics. Plaintiff Doe consistently received glowing reviews from students.

21.     During her time at Bard, Plaintiff Doe continued to be invited to prestigious institutions, including the University of Pennsylvania, Harvard, Princeton, and NYU, to address the student body and faculty of those institutions. Her work as an artist was featured in museums and galleries internationally and covered by the New York Times and Art Forum

## ii.  In Her 10 Years Of Employment, Plaintiff Doe Is Never Given A Promotion While Lesser-Qualified Faculty And Administrators Are

22.     Despite her impressive career, in her more than ten years at Bard, Plaintiff Doe never received a promotion, was never given an opportunity to pursue tenure and was kept in a "visiting" position in violation of Bard's policy of limiting "visiting" faculty to seven years. Meanwhile, White administrators who had lesser qualifications, including some whom the College knew to have a history of racism or sexual misconduct allegations, were promoted above her.

23.     Bethany Nohlgren, who came to Bard as "Student Activities Director" in 2005, holds only a one-year Master's degree in higher education administration, and, over the course of her time at Bard, was known by Jim Brudvig, Bard's Vice President of Administration, and Michele Dominy, Vice President and Dean of the College, to engage in racist conduct. Nonetheless, she was promoted to Dean of Student Affairs and Associate Vice President. Ms. Nohlgren's racist conduct is documented in numerous emails, parental complaints, and student attestations: though known to Bard, none were investigated.

6

*Jane Doe v. Bard College*                          Civil Complaint

24.     Erin Cannan, who held only a one-year Master's degree from Edinboro University of Pennsylvania, was promoted to Vice President of Student Affairs at Bard, Vice President for Student Engagement and Deputy Director of the Center for Civic Engagement. Erin Cannan's promotions and positions do not appear to have been based on relevant skills or meaningful accomplishments beyond an abiding deference to Bard's power structures, a recurring motif in Bard's self-referential, self-justifying administrative landscape resplendent with titles and honorary designations. When Plaintiff Doe attempted to engage Cannan and other colleagues in reading critical theory, history, or philosophy early on in her time at Bard, Ms. Cannan said it was "too difficult" and refused to engage.

25.     Bard alum Timand Bates was promoted to Associate Dean of Students despite numerous allegations known to senior-level Bard administrators and supported by multiple corroborating Bard alumni that he sexually harassed and bought drugs from students.

26.     David Shein, a good friend of Bard President Leon Botstein, was promoted to Associate Vice President of Academic Affairs and has for many years supervised Bard's Education Opportunity Program ("BEOP"), which most students on financial aid—the majority of whom are Black and Latinx—are required to participate in, even though Mr. Shein has no relevant academic or lived experience, and has been the subject of numerous complaints over the years, including verbal harassment, sexual harassment, sexual assault, racism, and homophobia. For many years, the BEOP structure was as follows: Mr. Shein supervised another white Bard employee, Jennifer Triplett, who supervised another white employee, Jane Duffstein, who supervised a series of Black and Latinx "assistant" directors, all of whom left their posts in a short amount of time due to the racist environment.

*Jane Doe v. Bard College*                                    Civil Complaint

27.     Mr. Shein's role as Dean of Studies has long meant that all Bard undergraduates must seek his approval if they wish to win highly competitive external scholarships, for which Mr. Shein serves as the gatekeeper.  For many students of color and LGBTQ students this means discriminatory exclusion.

28.     Bard alum Taun Toay was promoted to Senior Vice President and Chief Financial Officer of Bard College and Executive Vice President of Bard College, despite holding only an MPhil in economics, never having worked anywhere other than Bard College, and having no experience in higher education administration.

29.     Deirdre D'Albertis was promoted to Dean of the College and Vice President and has been at Bard for 30 years. D'Albertis supervises her own husband, Peter Gadsby, who is also a Vice President of Bard and has been the Bard Registrar for many years.

30.     Mark Halsey was promoted to Vice President of Institutional Planning and Research and was briefly an assistant professor elsewhere before spending decades at Bard, where he has not published more than a few articles (no books) and has nonetheless ascended to the top ranks of the Bard administrative and faculty structure.

31.     Coleen Murphy Alexander, Bard's Vice President of Administration, graduated from Bard College herself and has never worked anywhere other than Bard.  Like many of Bard's Vice Presidents, Coleen lacks a doctoral degree, and worked her way "up the ranks" without experiencing anything outside of the Bard College environment, except for a part-time Master's degree at SUNY Albany that she completed while also working. Her credentials and experience bear no relationship to the majority of college Vice Presidents at peer institutions. Ms. Alexander is in charge of the entire administration of Bard College, including highly sensitive matters such as discrimination, Title IX, and oversight of employee training. She is responsible for never having

8

created an ombudsperson; never having instituted anti-discrimination training for Bard employees; and presides over a nepotistic, insular workplace run in large part by people who have only ever worked at Bard College or, otherwise, are not qualified to seek comparable employment outside of Bard College.

32.     White administrators in positions comparable to Plaintiff Doe were all provided administrative assistants to facilitate their work, Plaintiff Doe was not.

33.     Notably, Bard is notoriously lacking diverse faculty. When it has hired Black employees over the years, they were almost invariably low-level hires who left Bard within a few years because of the toxic, hostile work environment and lack of equity, relative to their similarly-situated White peers, in promotion opportunities. When Bard did hire Black employees with advanced degrees for director positions or deanships, the vast majority would leave soon after they arrived. The narratives of those former faculty members are eerily similar: Bard systemically made them, as people of color, feel unsupported, disregarded, and degraded.

34.     A survey of Bard staff and faculty of color completed in 2020 confirmed that only one person of color employed at Bard believe Bard is a "good place for a person of color to work," *none* agreed that they were adequately compensated for their work, and 75% did not intend to remain at Bard for longer than two years.[1]

## 3.     PLAINTIFF DOE ADVOCATES FOR STUDENTS AND ENDURES A CONTINUOUS HOSTILE WORK ENVIRONMENT

35.     Plaintiff Doe worked to end the racism endemic at Bard that disadvantaged students of color, created a hostile work environment, and prevented her from being promoted.

---

[1] *See*
  https://docs.google.com/presentation/d/1cZIEKkhd8t6tna8NQGjJtkrXNTpJIb5KtsdoLFNBfbs/mobilepresent?slide=id.ga0568beff7_0_580

*Jane Doe v. Bard College*                                             Civil Complaint

i.    **Plaintiff Doe Complains That Bard Is Falsifying Its Diversity Data, Bard Ignores Her and Pushes Her Out**

36.    In 2009, as part of a grant application to the Hearst Foundation, Bard falsely claimed to have 169 Black students enrolled at the school— approximately three times the actual number. Plaintiff Doe was extremely disturbed and upset by the inclusion of plainly erroneous data that invented Black students that did not exist, yet the report was signed off on by Mr. Halsey, Ms. Cannan, Amy Ansell, the head of the Bard grants office, Judy Samoff, the former Dean of Programs, and Ariana Stokas. Ms. Stokas was then specifically tasked with data reporting to the state of New York for the Higher Education Opportunity Program (HEOP) program. Mary Backlund, VP and head of Bard's student affairs, also signed off on these numbers.  Bard received $300,000 from the Hearst Foundation, based in part on the reporting of false and inflated numbers of Black students.

37.    Plaintiff Doe created several reports for Bard's senior administrators that clearly showed this data was incorrect. In response, rather than correct the reported data, Bard senior administration–in particular Mark Halsey and Peter Gadsby–refused to allow Plaintiff Doe access to the relevant data—data she needed to do her job as the Director of Multicultural Affairs.

ii.    **Minority Students Are Funneled into a Program That Segregates Them from The Rest of the Student Body**

38.    Plaintiff Doe worked tirelessly in an attempt to address institutional racism at Bard and the staggering fact that when Plaintiff Doe arrived at Bard College, less than fifty percent of the students of color (Black and Latino) were able to graduate from the College in four years.

39.    Plaintiff Doe looked into the College's highly-problematic Bard Education Opportunity Program ("BEOP"). BEOP was a Bard program that Bard marketed as giving certain students—who were predominantly students of color—financial aid at Bard.  The program,

*Jane Doe v. Bard College*                                    Civil Complaint

however, also stigmatized students, most of whom were minorities, by, for example, requiring them to use text books loudly labeled "BEOP," publicly identifying them as students in need of financial aid, or as Bard's own website currently proclaims, "people who do not posses [sic] the financial means to afford a college such as Bard."[2] The shame of carrying textbooks marking them as "poor" resulted in BEOP students often attending class without their textbooks. BEOP students, currently described on Bard's own website not as part of Bard but as separate and other "non-traditional" "scholars" "benefitting from the Bard experience" were required to satisfy additional criteria that non-financial-aid students did not have to satisfy, *including by attending weekly classes in a basement on campus*, to address the racist preconceptions that, for example, low-income students universally needed instruction on "time management." These students were often also required to be on work-study as part of their financial aid. The additional burdens made it difficult for BEOP students to attend to their degree coursework.

40.    Non-BEOP students of color at Bard are also often treated with suspicion and as less capable, as mentioned by a recent film made by Bard alumna Rebecca Huntt,"Beba," in which Plaintiff Doe appears.

41.    BEOP was supervised not by faculty of color but by Mr. David Shein, a White man, who brought no relevant experience of or academic background in racial or economic inequality. With little day to day oversight, Mr. Shein handed off most of the duties to Jane Duffstein, who seemed uncomfortable and nervous around Black adults, such as Plaintiff Doe or her own "Assistant Directors," who came and went with dizzying frequency. Plaintiff Doe was informed

---

[2] *See* https://www.bard.edu/dei/programs/, last accessed August 12, 2022. By comparison, Vassar's financial aid webpage does not need to struggle with the spelling of the word "possess" because it describes students of limited financial means as equally entitled to a Vassar education, in large font stating that "Vassar seeks to make a College education affordable and accessible to all admitted students" in boldface, stating: "You do not have to be wealthy or even well off to attend Vassar."

*Jane Doe v. Bard College*                                                     Civil Complaint

that under their leadership a BEOP event was held featuring watermelon, Kool-Aid, and fried chicken, offending and embarrassing the BEOP students.

42.     Because of this institutional segregation and racism, as well as a chaotic administrative turbulence, BEOP students often sought refuge in the DMP project that Plaintiff Doe created.  Unlike the rapid turnover in BEOP, with administrators coming and going, Plaintiff Doe was at Bard for 12 years, longer than virtually any Black Bard director-level administrator in the history of the college. These students spoke of their frustrations about being treated disparagingly.

43.     Plaintiff Doe repeatedly brought to Bard's attention that the BEOP program, by treating BEOP students as less able than non-financial aid students and by imposing additional requirements on them that non-BEOP students did not have to satisfy, was crippling the ability of students on financial-aid, primarily students of color, to complete their degrees.

44.     BEOP students also complained about faculty to Plaintiff Doe. Specifically, Jane Duffstein, the former BEOP Assistant Director, who was then promoted to Director, was known to be hostile toward students and administrators of color. Students complained that she seemed angry and resentful when Black students succeeded academically. Plaintiff Doe reported numerous student complaints to Jim Brudvig and Michele Dominy. Nothing was done to address these concerns.

45.     BEOP staff of color, working primarily under white-identified directors, were known to leave Bard shortly after starting due to the hostile work environment. Each BEOP assistant director complained to Plaintiff Doe that they felt verbally demeaned by Bard faculty due to their race, that they were not taken seriously and not allowed to express their ideas. They said they also saw students of color being treated in disparaging and unprofessional ways, which they

*Jane Doe v. Bard College*                                              Civil Complaint

felt powerless to stop due to the institutionally accepted racism. Between 2012 and 2017, three BEOP assistant directors—two Black and one Afro-Latino—were hired and quickly left. Two of those Black administrators left within a year of being hired. One of those Afro-Latino administrators went on to a highly successful position as Dean of Students at NYU, while another is now completing a PhD.

46.     In 2013, Plaintiff Doe recommended that Bard hire Wendell Carter, an African-American teacher experienced with at-risk students, to work with BEOP. Instead, David Shein, Associate VP of Academic Affairs—and friend of Bard President Leon Botstein— continued to act as the supervising administrator for the BEOP reporting chain, despite multiple reports that he harassed Black students and administrators, and that students of color were facing institutional barriers to academic success founded in racist preconceptions of segregation and infantilization. As another suggestion, Plaintiff Doe urged VP and Dean of the College, Ms. Dominy, to address the situation by moving the BEOP reporting out from under Mr. Shein to a new "Dean of Inclusive Excellence."

47.     In 2014, Plaintiff Doe again urged the College to address racism and racial segregation on campus and expressed her concern to Ms. Dominy that students of color at Bard in Posse and BEOP were facing institutional barriers to academic success founded in racist preconceptions.

48.     In November 2015, Bard students, including Difference and Media Project students, organized and held a protest, Black Out Bard, in opposition to racism at the College with the goal of addressing racial discrimination on campus so that "Black students could go to class without fear." After the protest, in December 2015, in an email to Jonathan Becker, Bethany

Nohlgren and Erin Cannan, among others, Plaintiff Doe implored administrators to address discrimination on the Bard campus.

### iii. Plaintiff Doe is Told That Black Students on Financial Aid Cannot Pursue Additional Majors

49.    Over the years, Plaintiff Doe was told by multiple Black students on financial aid that the financial aid office refused to grant them the necessary financial aid to complete the degree they wanted and instead told them to "feel grateful" for what they had. They reported feeling demeaned and insulted.

50.    In 2014, one Black student, applying for a joint degree in Studio Art and Biology, was told that she "only needed one BA" and should "feel grateful for the aid she had already gotten."

51.    Plaintiff Doe was concerned about what appeared to be different- and lesser-treatment of Black students and explained to Mr. Brudvig, Chief Financial Officer and Vice President of Bard College and Peter Gadsby, Registrar, that it appeared as though Black students on financial aid were being treated as though they were "not entitled to a Bard education in the same way that [White students] are" and that the "admonishment" of these students for seeking more financially lucrative degrees was "not a good public face for the institution."

### iv. Plaintiff Doe's Campus Guests Are Held at Gunpoint in the Middle of the Night

52.    In 2009, the first year of plaintiff doe's employment at bard, she invited guests, eliot thornton and sienna shields, both of whom are black, to participate on a panel hosted by the dmp. The two guests were given bard housing during their stay, as was a guest of mr. Kyle gann, a white tenured-bard professor. The gann guest saw mr. Thornton and ms. Shields enter the bard housing they were given. Evidently alarmed at the presence of black people in the shared housing, "turning on and off lights" the gann guest called mr. Gann and reported that there were black

14

people in the housing. Mr. Gann immediately instructed her to call the police. The state police responded to the scene, *awoke plaintiff doe's guests at gunpoint*, and held them for several hours, interrogating them repeatedly through the middle of the night. The incident foreshadowed how plaintiff doe herself would be treated by bard college.

53.     Appalled, Plaintiff Doe alerted Erin Cannan. Ms. Cannan then met with Michele Dominy and Jim Brudvig to discuss the event. This prompted Mr. Gann to call Plaintiff Doe, screaming at her that he would make sure she lost her job over her complaint. Plaintiff Doe reported Mr. Gann's threatening call to Dean Dominy, Mr. Brudvig, and Ms. Cannan. No action was taken and no apology made to Plaintiff Doe or her guests who remain traumatized by the horrifying experience. Plaintiff Doe bore the vicarious trauma and shame of having invited guests to Bard, to then have them held at gunpoint in the middle of the night.

### v.     David Shein Disparages Black Faculty Member Christie Achebe, Professor Kristine Lane Criticizes a Black Student's Senior Project as Being "Anti White"

54.     In May of 2009, also within the first year of her employment, Plaintiff Doe was asked by David Shein to intervene to alter a proposed senior project by Black student Morgan Nesbitt. David Shein told Plaintiff Doe that the senior project was "insane" and "totally unacceptable" and that it was being supervised by Black faculty member Christie Achebe, who David Shein described as "crazy" and "off her rocker."

55.     Ms. Achebe explained to Plaintiff Doe that White psychology Professor Kristin Lane refused to be on Mr. Nesbitt's senior project committee—even though he was majoring in psychology—*because she found his senior project to be "anti-white."*

56.     The result of Bard's treatment of Christie Achebe was that both Christie and her husband Chinua Achebe left Bard College. Chinua Achebe told Plaintiff Doe in 2009 that he could "not stay at a place that treated his wife that way."

15

*Jane Doe v. Bard College*                                        Civil Complaint

57.     Other than Ms. Achebe, there have been no Black professors in Bard's psychology department since Professor Achebe's departure.

58.     Mr. Shein's disparagement of Ms. Achebe was Plaintiff Doe's introduction to Bard's practice of disparaging faculty and administrators of color. This incident, along with other similar incidents, made Plaintiff Doe, herself a person of color, feel afraid and unsettled.

### vi.  Dean Bethany Nohlgren Demeans Plaintiff Doe Due to Her Race, Advises Students to Avoid Schools with Black People

59.     Within Plaintiff Doe's first weeks at Bard, Ms. Cannan said that she and senior administrator Bethany Nohlgren found Plaintiff Doe to be "intimidating." Ms. Nohlgren went on to tell Plaintiff Doe that Plaintiff Doe reminded her of her adopted Black sister who had severe mental illness. Numerous Black Bard alumni, both men and women, have reported that Nohlgren also compared them to the adopted Black sister who, in Nohlgren's own words, "she is not in contact with and is afraid of."

60.     Ms. Nohlgren openly shared with students her own discomfort with Black people to students. In one instance in 2011, Ms. Nohlgren advised a student that he might feel uncomfortable transferring to the University of Chicago because it was in a neighborhood with many Black people. She asked this student to think about his comfort levels around people of color. That student immediately went to Plaintiff Doe to report this. Plaintiff Doe reported this to Jim Brudvig and Dean Dominy many times. Her complaints were ignored.

61.     In another instance around the same time, Ms. Nohlgren informed a student that neither Plaintiff Doe nor Ms. Tabetha Ewing—one of the other few Black professors at Bard— were professors in the Human Rights Department and that they could not advise students in Bard's Human Rights Program. This was not true. Plaintiff Doe and Ms. Ewing served as Human Rights

*Jane Doe v. Bard College*                                        Civil Complaint

Program advisors. Plaintiff Doe reported this to Jim Brudvig and Tom Keenan, the Chair of the Human Rights Department. Her complaints were ignored.

62.    Students and families of color regularly told Plaintiff Doe that Ms. Nohlgren treated them in a disparaging manner and that their drug and mental health problems were treated as criminal by Ms. Nohlgren, while white students received support.

63.    In another instance, Ms. Nohlgren described a student of color as "verocious," a slang word commonly applied to animals to mean a cross-between ferocious and vicious.

64.    Despite these instances, many of which were reported to Bard, Bard promoted Ms. Nohlgren to Dean of Students and Associate Vice President of Student Affairs in 2021.

**vii.    Faculty Member Amy Ansell Describes Plaintiff Doe as "Feral"**

65.    In 2009, Plaintiff Doe taught a tutorial that she designed called "Race and the Pastoral," which proved exceedingly popular with students. Tutorials at Bard were electives that typically received little attention from established departments or administrators. Despite this, Plaintiff Doe's tutorial was brought up at a Literature Department meeting and then at a meeting with Bard's Executive Committee, consisting of top administrators, all of whom were White.

66.    Ms. Amy Ansell, who is white, and was then head of Studies of Race and Ethnicity at Bard, invited Plaintiff Doe to a meeting at the request of VP and Dean of College Dominy. There, Ms. Ansell disparaged Plaintiff Doe, saying, "The problem is really that you can't teach in English, and you don't have the qualifications to teach in Social Studies. You don't have any real training.  And the thing is, the Literature faculty really are opposed to you doing any teaching there… ***The real problem is that your teaching is feral. It's feral. What you're doing is feral."*** Plaintiff Doe, in fact, had plenty of training, culminating in a Ph.D. in English and American Literature and Language from Harvard, where she also taught courses in various disciplines,

including Literature, History, and Medieval Studies. The real reason behind Ms. Ansell's attack is revealed in her use of the word "feral," meaning savage beast, incapable of domestication. To Ms. Ansell, Plaintiff Doe was a wild Black woman who could not be trusted with enforcing the status quo racial hierarchy, and whose credentials should be dismissed out of hand. Plaintiff Doe was shocked and humiliated.

### viii.   David Shein Tells Plaintiff Doe Not to "Think So Much of Herself," Discriminates Against Plaintiff Doe's Black Students, Assaults Plaintiff Doe's Partner

67.     In her first year at Bard, in 2009, while Plaintiff Doe was walking to the campus center, senior administrator David Shein accosted Plaintiff Doe by blocking the sidewalk in a physically threatening manner. In a loud voice, he said, "You shouldn't think so much of yourself because of your pedigree!" Plaintiff Doe immediately felt threatened and left the area; however, she did not, and could not, report this to her supervisor, Ms. Cannan, as Ms. Cannan appeared to be in a romantic relationship with Mr. Shein at the time. In the office, the two were referred to as "mom and dad" by the other administrators. Plaintiff Doe was extremely uncomfortable with the lack of professionalism or boundaries in this setting, which was chummy and insular, with frequent heavy drinking and insider humor.

68.     When Plaintiff Doe eventually did report this frightening experience to her new supervisors, Ms. Dominy (then Dean of the College) and Vice President Mark Halsey, no investigation or discipline of Mr. Shein followed.

69.     Mr. Shein's hostility toward people of color also came across in his dealings with Plaintiff Doe's students. As Mr. Shein ran the external fellowships program, he regularly excluded highly-qualified students of color from fellowship nominations. Students complained to Plaintiff Doe that Mr. Shein discounted their applications and discriminated against them. Colleagues also

*Jane Doe v. Bard College*                                          Civil Complaint

told Plaintiff Doe that Mr. Shein was so hostile toward Black male students that they, occasionally intervened to remove crying students from his office.

70.     Mr. Shein's hostility toward Plaintiff Doe also extended to her partner. On April 10, 2010, *while Plaintiff Doe's partner was on crutches*, Mr. Shein violently yelled at her and threw his car keys at her because she had been slow to get to the driver's seat of her car after dropping off Plaintiff Doe.  Plaintiff Doe reported the altercation to her supervisors, Ms. Dominy and Mark Halsey. Mr. Halsey, however, was friends with Mr. Shein, and rather than disciplining Mr. Shein, he laughed in Plaintiff Doe's face. Plaintiff Doe also informed Ms. Jennifer Triplett, Director of Academic Advising, who shrugged her shoulders and merely described Mr. Shein as a "drunk." Separately, Ms. Dominy made clear to Plaintiff Doe that over the years, she had tried to remove Mr. Shein from Bard for his misconduct but that he was untouchable and protected by President Botstein and Mr. Halsey. There was no inquiry by Bard into this incident, nor was there any discipline or admonishment of Mr. Shein for his egregious conduct that violated Bard's policy.

71.     The reporting structure at Bard was often changing. When, in 2014, Plaintiff Doe began reporting to Mr. Jim Brudvig,  Chief Financial Officer and Vice President, she recounted to him the various hostilities and discriminations she had faced, in particular those at the hands of Mr. Shein over the years, all of which resulted in no investigation. Though Mr. Brudvig expressed sympathies, he told Plaintiff Doe that if he complained about Mr. Shein's behavior, Mr. "Shein's lawyers would be all over [him]."

72.     When the new dean, Becky Thomas, took over in 2015, Plaintiff Doe again recounted her experiences with discrimination and hostility at Bard. Again, no investigation was conducted.

ix.  **"As Soon as You Come into a Room Here, It's As If You Have Already Done Something Wrong."**

73.  Binyavanga Wainaina, Director of Bard's Achebe Center from 2009 to 2012, told Plaintiff Doe that he overheard faculty, in a group dynamic, saying disparaging things about her due to her race, calling her, amongst other things, arrogant.

74.  In 2012, Mr. Wainaina explained he was leaving Bard after only three years because, as a Black person, he felt, "as soon as you come into a room here, it's as if you have already done something wrong."

x.  **From 2012 to 2014, Plaintiff Doe Again Observes Bard Treating Black Administrators Differently than Similarly-Situated Whites**

75.  In 2012, Bard hired an Afro-Latino man as Assistant Director of BEOP. He announced his departure eight months later, telling Plaintiff Doe that he found the environment at Bard to be oppressive and professionally demeaning. This individual went on to a successful career at the University of Vermont and then New York University.

76.  As a replacement, Bard hired another African-American man in 2013. A few months later, that individual told Plaintiff Doe he was looking for a new job because he felt BEOP had a White-run abusive structure that replicated structural racism and handicapped students, which he felt powerless to change within the existing reporting chain (he reported to White administrator Jennifer Triplett, Ms. Triplett to White Administrator Jane Duffstein and Ms. Duffstein to White Vice President David Shein). He told Plaintiff Doe that the work environment at Bard was so racist and hostile toward him that he could not remain.

77.  That individual was himself replaced by yet another Black administrator who also relayed to Plaintiff Doe that Bard's environment was so hostile, toxic and racist that it made her physically unwell. This third person left within a few years as well.

xi.  **Bard Employee of Color Feels Monitored in Discussions with Other Black Administrators**

78.  In 2014, a Bard administrator of color wrote to Plaintiff Doe that he was unable to have conversations with other administrators of color without being monitored, which he felt was a way to prevent him from forming relationships with other people of color. He said he "figured out" that Bard's "formula" was to "isolate all of the [people of color] so we don't band in unity." This same Bard administrator confided in Plaintiff Doe that he experienced headaches, and felt hopeless and depressed due to the hostile work environment, and that Ms. Duffstein, his White supervisor, said he would never be promoted or amount to anything.

xii.  **Plaintiff Doe Reports Physical Assault by Racist Student Known for Harassing Women of Color, Bard Takes No Action**

79.  On April 15, 2015, student Ethan Quinones stormed into Plaintiff Doe's office unannounced shaking and screaming at the top of his lungs. He advanced toward her in a menacing way and backed her up against the wall screaming, "Harvard should never have given you a Ph.D. because you are a stupid idiot! You are a fucking moron! Why is Bard paying money for this?!" He apparently took issue with an art project that DMP sponsored that centered on racial discrimination. Plaintiff Doe called Mr. Travis Brock Kennedy, in an adjacent office, to come help her. The two reported the incident to Ms. Nohlgren. Nothing was done to provide Plaintiff Doe with more safety, nor was she provided with a means for securing her office, which other faculty and professors were given.

80.  Concerned that Mr. Quinones posed an ongoing threat to students of color, Plaintiff Doe wrote to Ms. Nohlgren, "What worries me is I've also seen mania turn violent…. I asked [Ethan's girlfriend] if [Ethan] ever became violent and she burst into tears…… I'm also really concerned for [her]."  No one from Bard ever contacted Mr. Quinones' girlfriend about her safety.

*Jane Doe v. Bard College*                                    Civil Complaint

Had someone done so, they would have learned that Mr. Quinones had threatened to kill her the year prior, and that he stormed into Plaintiff Doe's office because of his furor over her engagement in the Difference and Media Project, which confronted challenging racial dynamics.

81.     On April 21, 2015, Plaintiff Doe reported to Ms. Nohlgren that there were "numerous reports coming into [her] about other students (of color, mostly) that feel harassed by Ethan Quinones– the majority are also, worryingly, women– he's making people feel uncomfortable in classrooms and social settings as well as online." Bard did nothing to protect Plaintiff Doe or vulnerable students from Mr. Quinones. Plaintiff Doe continued to ask for a card key lock to her office, which other administrative offices had. Even as Plaintiff Doe faced threats, Bard declined to ensure her safety.

82.     Instead, on information and belief, four years later, Ms. Nohlgren used her knowledge of Mr. Quinones' animus toward Black people to solicit complaints from Mr. Quinones about Plaintiff Doe, which, as described below, were themselves racist and part of an orchestrated investigation to get Plaintiff Doe fired.

83.     In 2018, Plaintiff Doe reported to Mr. Brudvig that she had received emails from alumni, Lauren Roe[3] ("Lauren"), threatening violence. Plaintiff Doe was again never given additional security to her office. Instead, administrators later used Lauren's threats as an opportunity to launch a pretextual investigation against Plaintiff Doe in retaliation for her advocacy on behalf of students of color.

---

[3] Lauren Roe is a fictious name to protect the identity of the individual due to privacy concerns.

*Jane Doe v. Bard College*                                    Civil Complaint

**xiii.    Michele Dominy Frequently Tells Plaintiff Doe She Would Never Be Promoted Due to Her Race**

84.    Ms. Dominy, Dean of the College until 2015, regularly advised Plaintiff Doe to leave Bard because the rampant institutional sexism and racism would prevent her from ever being promoted. Yet, Ms. Dominy perpetuated the toxic environment she ostensibly criticized. In 2014, Plaintiff Doe reported to Ms. Dominy that she was being sexually harassed by Mr. Nicholas Lewis, a new employee at the time and a close friend of President Botstein. *Specifically, Plaintiff Doe reported that Mr. Lewis touched her and called her "high yellow sweetie."* Ms. Dominy told Plaintiff Doe that President Botstein and Mr. Lewis had a close relationship, and that President Botstein wanted to see Mr. Lewis advance in his career. Ms. Dominy nonetheless emailed Bard's Title IX administrator, Ms. Tamara Stafford, who then contacted Plaintiff Doe to discourage her from bringing any formal charges. Bard undertook no investigation of Mr. Lewis, and in 2022, he was promoted to Associate Vice President of Academic Initiatives and Associate Dean.

i.    Ms. Dominy regularly made hostile comments about the few people of color on the faculty, including Mr. Binyavanga Wainaina and Ms. Ewing, the latter of whom Ms. Dominy criticized for various character flaws including "poor judgment." Worse, whenever there was a faculty position opening, Ms. Dominy would complain aloud that there was "no way to find qualified candidates of color." Plaintiff Doe could not believe this, particularly because she regularly brought people of color to give talks and share scholarship at Bard in hope of a post. None were hired at Bard, despite their impressive qualifications. Many were hired by other colleges and universities (Princeton, for example.)

85.    In Ms. Dominy's more than fifteen years as Dean of the College, approximately two Black professors received tenure. In the STEM and English departments, there were no Black

tenured professors at all.  At present, there has never been a single Black tenured professor in most of Bard's academic departments and across entire divisions.

### xiv.     Professor Kris Feder Calls Asian Students Superior to Black Students

86.     In 2015, Plaintiff Doe participated on a board of professors reviewing a project by a Black student. After the presentation concluded, Ms. Kris Feder, a White professor, referred to Asian students as superior to Black students.

### xv.     Plaintiff Doe is Threatened to Not Complain About Hostile Acts Against Her

87.     In 2016, Plaintiff Doe was informed that there had been a Black dean at Bard whom Mr. Shein referred to as "a bitch." When this former dean complained about the incident at the time, Mr. Shein said the former dean was pushed out and made to feel so uncomfortable that he was forced to leave.

### xvi.     Bard Keeps a Violently Smashed Bust of Obama Inscribed With "FUCK Obama!" in a Public Space

88.     Also in 2016, Plaintiff Doe was made aware of a smashed bust of President Obama, which was inscribed with "Fuck Obama!" that was left in a public building adjacent to Bard administrative offices. As a Black woman, Plaintiff Doe felt personally attacked by the violence done to a bust of the nation's first Black president. She informed Jim Brudvig, Bard's Chief Financial Officer and Vice President. The bust was not removed for several months.

### xvii.     Bard Refuses to Interview a Black Physics Professor, Tells Plaintiff Doe That "No Black Physics Student Has Ever Graduated from Bard College"

89.     In 2016, Bard refused to allow a Black physics scholar to visit the campus for an interview, telling Plaintiff Doe that Bard had never graduated a Black physics student. Plaintiff Doe was given the impression that Bard did not want this physicist to visit because it did not want to encourage students of color to pursue physics.

*Jane Doe v. Bard College*                                   Civil Complaint

**xviii.    Bard Refuses to Promote Plaintiff Doe**

90.    In 2012, Plaintiff Doe developed an "Assistant Dean for Inclusive Excellence" position, which she envisioned as a new, higher-salaried job that would promote inclusivity and diversity at Bard. With encouragement from Ms. Dominy and Mr. Brudvig, Plaintiff Doe worked diligently to continue refining and developing the position, and she was continuously told she was "definitely" going to get a promotion and raise. Plaintiff Doe continued to work on the proposal for the next few years, with no action from Bard.

91.    Four years later, in 2016, Bard finally staffed the "Dean of Inclusive Excellence" post, but, rather than hiring Plaintiff Doe, the job was given to Bard alumnus and White-identified Hispanic, Ariana Stokas, who was less qualified than Plaintiff Doe and who had also signed-off on Bard's reporting of false diversity data to the Hearst Foundation in 2009, described *supra*. Plaintiff Doe did not receive a promotion.

92.    In 2017, Plaintiff Doe again complained about Bard's failure to promote her after eight years of employment. Vice President of Administration Jim Brudvig promised her a raise. Plaintiff Doe *never* received the promised raise or promotion.

**xix.    Bard Refuses to Intervene When Plaintiff Doe and Other People of Color Are Sent Vile Emails Including, "What's Up N**ger B**ch"**

93.    In 2018, Plaintiff Doe and other Black people on campus received anonymous emails which read, ***"What's up n**ger b**ch," and "GO BACK TO AFRICA you f-ing C*NTS."*** Plaintiff Doe reported this to administrators. While Bard apparently determined the sender was a Bard alum, it refused to disclose this person's identity to Plaintiff Doe and others concerned, leaving them in the dark about their safety. No apparent action was taken against the sender, nor were any steps taken to protect Plaintiff Doe or the targeted students of color at Bard. Plaintiff Doe again did not receive a card key for her office door.

*Jane Doe v. Bard College*                                                                Civil Complaint

xx. **Plaintiff Doe Is Racially Profiled in The Dining Hall, Bard Takes No Action**

94.    On April 18, 2018, while Plaintiff Doe was with a guest presenter whom she brought to campus, she was accused by foodservice workers of stealing food from the dining hall. Plaintiff Doe was aggressively followed and yelled at. She immediately reported the incident to VP of Administration Jim Brudvig, with a corroborating statement from her guest. No investigation was conducted or remedial action taken.

4.    **BARD'S CONTINUAL FAILURE TO PROTECT VICTIMS OF SEXUAL SOLICITATION, HARASSMENT AND ASSAULT**

In addition to Bard allowing rampant, violent racism to go unaddressed for years, it also systematically silenced and failed to protect students who had bravely come forward with allegations of sexual misconduct and assault. Such allegations began within Plaintiff Doe's first year of employment at Bard.

i.    **Bard Fails to Adequately Report Allegations of a Staff Member Sexually Soliciting and Harassing Students in Violation of the Clery Act**

95.    In Plaintiff Doe's first year employment, two students reported to her that Ed Schmidt, Bard's then Director of Transportation, attempted to sexually solicit students and had on several occasions exposed his genitalia to them. Plaintiff Doe immediately reported this to Dean of Students, Erin Cannan, and Pat Walker, Director of Human Resources.

96.    Soon thereafter, on November 23, 2009, Plaintiff Doe received an email from Ms. Cannan addressed to a Bard listserv named "Keepsafe" that Mr. Schmidt had "been laid off for budgetary reasons." At no point did the administration notify the police as is required by the Clery Act, nor was the student body notified that there may have been a sexual predator on campus. Bard also did not include the reported alleged crimes of Mr. Schmidt in its ASR crime data, also required by the Clery Act.

*Jane Doe v. Bard College*                                        Civil Complaint

97.     Instead, Ms. Cannan was promoted to Dean of Student Affairs.

**ii.   Plaintiff Doe Reports Alleged Sexual Harassment and Assault Perpetrated by David Shein, Bard Takes No Action**

98.     Sexual predation by Mr. Shein, Bard's Associate Vice President for Academic Affairs and Dean of Studies, is spoken of openly by students, alumni, faculty, and administrators. Mr. Shein is a White male, long-time Bard administrator, and close friend to President Leon Botstein.

99.     At a 2012 reunion, Plaintiff Doe recalls numerous alumni sharing stories of Mr. Shein sexually preying upon students of color. Plaintiff Doe was horrified and dutifully reported this to then Dean of the College, Ms. Dominy, and to VP of Administration, Mr. Brudvig. No investigation was conducted. Dean Dominy had previously told Plaintiff Doe numerous times that she knew of the allegations against Mr. Shein, including of sexual harassment and of drinking with students and that she had tried to get Mr. Shein fired but was unable to because of his close relationship with President Botstein.

100.    Thereafter, whenever Plaintiff Doe again raised student concerns about Mr. Shein's alleged behavior with Dean Dominy, she would acknowledge it, but again say there was nothing she could do. Other faculty members were concerned as well. In 2014, Ms. Rebecca Stacy, director of Bard's counseling program BRAVE, told Plaintiff Doe that a student had reported being sexually assaulted by Mr. Shein. Ms. Stacy said she felt she could not report it because she would lose her job. Again, Plaintiff Doe reported this to Mr. Brudvig and Dean Dominy. No investigation was conducted nor was Mr. Shein suspended from campus.

101.    Plaintiff Doe informed other administrators, including Mr. Brudvig, of the serious allegations against Mr. Shein. These administrators expressed disgust at Mr. Shein's alleged behavior, but no investigation followed.

27

102. The alleged sexual predation by Mr. Shein dates back decades. Bard Professor Tabetha Ewing reported to Plaintiff Doe that in the early 2000s, Mr. Shein made out with a student on the dance floor at a Bard-sponsored party illuminated for all to see after a DJ shined a light on them.

103. In 2015, a student reported to Plaintiff Doe that Mr. Shein drunkenly called her late at night, slurring his words while rambling about her senior project. The following day, Mr. Shein called this student into his office and intimidated her into not reporting him while emphasizing his power over her senior project. While the student shared the incident with Plaintiff Doe, she chose not to file a more formal complaint, afraid of the power Mr. Shein wielded over her and her academic success.

104. Over many years, Bard routinely disregarded Mr. Shein's long and well-known history of sexual predation allegations while giving him authority over important decisions affecting students, like fellowships, probationary status, and acceptance of credits. Mr. Shein has been allowed to stay in his position, which has kept him in extremely close proximity to students.

### iii. Plaintiff Doe Reports Alleged Inappropriate Conduct by Bard's Daniel Mendelsohn. Bard Takes No Action.

105. In 2014, a male Bard student informed Plaintiff Doe that Daniel Mendelsohn, a celebrated writer and Classics professor at Bard, invited him to dinner and drinks, and then to stay the night at his home with him. According to the student, after the dinner and drinks, Mr. Mendelsohn invited this Bard student to watch a movie in his bed. The student ended up hospitalized with alcohol poisoning.

106. On September 10, 2014, Plaintiff Doe reported this allegation to VP of Administration Jim Brudvig and VP and Dean of the College Michelle Dominy. Bard did not follow up with the student or conduct any investigation of Mr. Mendelsohn. The student himself

28

feared reporting the incident further because he is in the same academic discipline as Mr. Mendelsohn, who is powerful in his field.

### iv.   Plaintiff Doe Reports Sexual Harassment of Students by Timand Bates, Bard Takes No Action.

107.   On November 9, 2017, Plaintiff Doe reported to VP of Administration Jim Brudvig that she had been informed that Timand Bates, the Assistant Dean of Students, sexually harassed students, and both used drugs with and bought drugs from students. Plaintiff Doe also reported this to Mary Ann Krisa, Bard's First-year Dean, and a close colleague of Mr. Bates. Ms. Krisa confirmed that she was aware of his behavior but thought nothing could be done because of his close relationship to Associate VP of Academic Affairs David Shein, who was himself protected by President Botstein. Bard failed to initiate any investigation of Timand Bates. Instead, Timand Bates was promoted to Associate Dean of Students.

### 5.   BARD RETALIATES AGAINST PLAINTIFF DOE FOR SUPPORTING A RAPE VICTIM, ATTEMPTS TO SILENCE THE VICTIM

108.   In November 2015, Student Doe[4], a Black student, informed Bard's then-Title IX coordinator, Linda Morgan, that she had been raped by a White male student in a Bard dorm and requested that Ms. Morgan issue a No Contact Order or remove the student from campus to protect her from further abuse. Bard refused. Student Doe then reported ongoing stalking and harassment by her abuser over the next six months, including repeated use of the N-word. She continuously requested a No Contact Order, to no avail.

109.   Only after a White female student reported that the same White male student had also raped *her* did Bard finally issue a No Contact Order for all alleged victims and finally launched an investigation in May 2016. Even though the male student was eventually expelled, Bard

---

[4] Student Doe is a fictitious name used to protect the identity of the rape victim.

*Jane Doe v. Bard College*                                          Civil Complaint

continued to neglect to provide accommodations or support for Student Doe. Instead, in a letter signed by Mr. Shein, Timand Bates and Bethany Nohlgren, Bard *attempted to silence Student Doe* by dismissing her from the college, telling her that she is not "Bard material."

110.    When Student Doe told Plaintiff Doe of Bard's mishandling of her assault and its attempt to remove her from campus, Plaintiff Doe brought the matter to the attention of VP Mr. Brudvig, who held meetings with Student Doe, usually with Plaintiff Doe present. Plaintiff Doe urged Bard to comply with the law in its response to sexual harassment and sexual assault on campus, and she vocally objected to Bard's focus on "damage control" to its public image rather than protecting students. Her complaints were communicated to Bard management.

111.    Despite this, *Bard persisted in attempting to remove Student Doe from campus*. On September 12, 2017, Plaintiff Doe received an email from Dean of Student Affairs, Ms. Nohlgren, telling her to "not encourage [Student Doe] to go to classes or be in classes this fall."

112.    In November 2017, appalled by Bard's flagrant and unacceptable failure to address sexual assault and sexual harassment on campus, Plaintiff Doe drafted a research-based administrative plan to address the troubling issues on campus. She shared it with Jim Brudvig, noting, "I think we are better than this at Bard but it's time for us to really shift what we are doing." The two spoke about it extensively. Bard made no change.

113.    In September 2018, Student Doe filed a lawsuit against Bard for violating Title IX, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000, 504 of the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. 12101, and related New York State laws. *The following day*, Mr. Brudvig called Plaintiff Doe into his office *and blamed her for the lawsuit*, saying, "The college is extremely upset about this. This is extremely damaging," and aggressively asking, "Did you know anything about this?" and "Were you consulted in this matter?"

30

**6.      BARD RETALIATES AGAINST PLAINTIFF DOE**

114.   Following Plaintiff Doe's support of Student Doe—all protected activity under both Title IX and 42 U.S.C. § 1981—Bard administrators began retaliating against Plaintiff Doe, including by undermining the Difference in Media Project (DMP) and raiding its budget.

115.   It was clear Bard was preparing to remove Plaintiff Doe but knew firing her outright would be too blatantly retaliatory. **First**, Student Doe had recently filed her complaint, which Plaintiff Doe supported and terminating Plaintiff Doe so soon thereafter would be clear retaliation. **Second**, Bard had no justification for removing an employee who had never had poor reviews and who was trusted and relied upon by students. **Third**, Plaintiff Doe had no record of violating any Bard policy. **Fourth**, from the initial filing of Student Doe's lawsuit until June 3, 2019, Plaintiff Doe had significant academic responsibilities teaching courses, supervising senior projects, and organizing highly public and much-anticipated events, including one attended by 1,500 people in May of 2019.

116.   On May 21, 2019, in preparation for removing her from campus Mr. Becker sent an email to Plaintiff Doe asking for a bullet point list of her job duties and any committees on which she had worked.

117.   On June 27, 2019, Plaintiff Doe was asked to remove her things from her office.

118.   On July 18, 2019, President Botstein announced that VP of Administration, Mr. Brudvig, who had also ended up supporting Student Doe, was abruptly demoted from Vice President for Finance and Administration and Bard's Chief Financial Officer to Visiting Professor of Philosophy and put on a year sabbatical, removing him from campus.

119.   On July 30, 2019, Student Doe withdrew her lawsuit against Bard College.

*Jane Doe v. Bard College*                                        Civil Complaint

120.   Just two weeks later, on August 16, 2019, while students were on summer break and without ever speaking to Plaintiff Doe or doing a preliminary investigation, Kimberly Alexander, Director of Human Resources, informed Plaintiff Doe that she was suspended from campus and forbidden from contacting all students and alumni. Plaintiff Doe was told that for the first time after nine years of employment without issue, there were all of a sudden multiple "complaints from students and alumni concerning [her] behavior." Plaintiff Doe was not told what the complaints were.

121.   In suspending Plaintiff Doe, Bard failed to follow the express terms of its Employee Handbook, which explicitly states that "[W]ith respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal warning; a next offense may be followed by a written warning; another offense may lead to a suspension; and, still another offense may then lead to termination of employment."

122.   The Faculty Handbook specifies that "In the event of the suspension or dismissal of a teacher (in any category) before the expiration of his or her contract, consultation, a written statement of reasons, and the opportunity for a hearing under Article V will be accorded. It is understood that the President bears the burden of proof in procedures governed by Article V."

123.   For the next year and a half, Mr. Mark Brossman, Bard Trustee and close ally of President Botstein, directed an invasive, pretextual investigation against Plaintiff Doe for the purpose of finding a reason to terminate her employment. The investigation was itself infected with racism, sexism and homophobia. Though Bard took care to create a façade of impartiality by hiring an "outside" attorney, Mr. Brossman, Bard Trustee, called the shots. For example, *at Mr. Brossman's direction*, Ms. Dizon refused to allow Plaintiff Doe to see the alleged complaints made against her or record an interview conducted with her.

*Jane Doe v. Bard College*                                                   Civil Complaint

7.      **THE YEAR-AND-A-HALF SHAM INVESTIGATION AGAINST PLAINTIFF DOE**

124.    As time wore on, it became apparent that no complaints from "students" had been made. Instead, on information and belief, Bard administrators had *themselves elicited* complaints from two alumni. The first, Lauren Roe, an alumnus who had graduated years prior and whom Dean Nohlgren knew suffered from severe mental instability, had equated herself with Ted Kaczynski, was not credible, and had made threats against Plaintiff Doe in the past. The second, Harper Zacharias, another alumnus who had very little contact with Plaintiff Doe as a student but was working with Jonathan Becker and, upon information and belief, was *asked* by Mr. Becker to complain about Plaintiff Doe. And, later, a third was elicited from Mr. Ethan Quinones, the student who years before Bard knew had attacked and racially harassed Plaintiff Doe in her office and who, in the complaint Bard required Plaintiff Doe to respond to, alleged Plaintiff Doe was "lying" when she told students that she was chased and called the "n" word in lily white Red Hook, New York, where Bard is located.

125.    Plaintiff Doe was forced to respond to racist and homophobic allegations – including that a photo shoot one of her students did was "inappropriate" because it engaged difficult questions of racial subjugation, that she, by simply being a gay woman, created a "hypersexualized" environment though no specific "hypersexualized" words or conduct were ever alleged,  required her to prove that two artists who had presented at campus, one of whom was Black, were not "dangerous," and that she was lying when she related to students her personal experiences of racial hostility in Red Hook, New York. Plaintiff was also forced to endure the humiliation of suspension from campus for nineteen months while Bard's "investigation" grew ever wider in an attempt to uncover a plausible reason for firing her.

*Jane Doe v. Bard College*                                    Civil Complaint

126.    No reason to terminate Plaintiff Doe could be found.  On March 3, 2021, nineteen months after Plaintiff Doe was suspended without notice from campus, Bard sent a "notice of outcome letter" to Plaintiff Doe, notifying her of the outcome of the investigation. The investigator had not found sufficient evidence of any offense worthy of termination. The investigator had only found sufficient evidence that Plaintiff Doe "emotionally shared" with students, possibly did not establish "adequate" boundaries with Lauren Roe (an individual who, ten years prior, Plaintiff Doe had been asked by Bard administrators to act in *loco parentis* for because she was suicidal) and had "inappropriate conversations with students about the personal and professional lives of colleagues and faculty members"; essentially, that Plaintiff Doe, in her duty to protect Bard students, failed to keep Bard administration secrets, including by telling students about the administration's cover up of the Ed Schmidt incident and sexual predation of Bard students by Bard faculty.

127.    On information and belief, the investigator did not recommend that Plaintiff Doe be terminated.

128.    Nonetheless, on March 3, 2021, nineteen months after launching the pretextual investigation, Bard terminated Plaintiff Doe.

129.    The "investigation" was not designed to determine whether Plaintiff Doe posed a threat to students but rather served as a pretext to terminate her and was itself an act of workplace harassment in requiring her to answer, not for any allegedly wrong acts, but for being a gay Black woman at a nearly all-white school in a nearly all-white town.

## 8.    BARD HAS A POLICY OR PRACTICE OF RACIAL DISCRIMINATION AND OF CONDONING SEXUAL MISCONDUCT

130.    Bard College is required to submit periodic reports to the Middle States Commission on Higher Education to operate as an accredited college.

*Jane Doe v. Bard College*                                    Civil Complaint

131.    One of the standards that Bard must meet for accreditation is Standard II, "Ethics and Integrity." To meet that standard, the Middle States Committee on Higher Education requires its accredited Colleges to "possess and demonstrate" a climate that "fosters respect among students, faculty, staff, and administration from a range of diverse backgrounds, ideas and perspectives."

132.    In 2007, the "Integrity Committee" of Bard's "self-study" included in Bard's report to the Middle States Commission the "action point" that an "often-mentioned need among community members is the need for regular orientation for new administrative and staff hires, especially new managers, and particularly in such highly regulated areas as sexual harassment and intervention."

133.    Bard did not, between 2009 to 2019, require staff or faculty to complete any racial harassment or racial bias training, despite the many complaints of which the College was aware, the extremely high turnover of Black staff and faculty and the low graduation rates of students of color.

134.    Further and upon information and belief, Bard did not require faculty to receive adequate training on sexual harassment. Lack of training extends to the Vice President for Administration, Coleen Alexander, who told a gay male employee complaining of sexual harassment in 2020 that "gay men can't be sexually harassed by women."

135.    The Middle States Committee on Higher Education also requires accredited institutions to "possess and demonstrate" a "grievance policy that is documented and disseminated to address complaints or grievances raised by students, faculty, or staff" and that the policies and procedures be "fair and impartial" and grievances "addressed promptly, appropriately, and equitably."

*Jane Doe v. Bard College*                                        Civil Complaint

136.    In 2007, because Bard lacked the impartial grievance procedure required for accreditation, the Integrity Committee recommended, as part of its accreditation reporting, that Bard appoint an ombudsperson trained in conflict resolution because "the community could benefit from the establishment of a confidential and impartial counseling process" instead of having "grievances resolved by the Office of the Vice President for Administration."

137.    Despite this clear recommendation and accreditation requirement Bard did not appoint an ombudsperson or establish a "fair and impartial" grievance process. Instead, five years later, Leon Botstein, President of Bard College since 1975, wrote in the Periodic Review Report to Middle States that Bard was *still* "considering" appointing an ombudsperson.

138.    To date, Bard has never appointed an impartial ombudsperson and President Botstein, President of the College for over forty years, continues to control personnel decisions. Bard's governance structure is instead intentionally designed to insulate friends of President Leon Botstein from accountability.

**9.    BARD'S CONTINOUS FAILURE TO ADDRESS SEXUAL AND RACIAL MISCONDUCT ALLEGATIONS**

139.    Three federal complaints were launched against the College for its failure to address sexual harassment on campus. In an open house event referred to in a 2015 complaint, three students reported that President Botstein told them it was not the College's role to police the personal lives of students, and, horrifyingly, *that sexual assault would happen in students' personal lives.* He allegedly went on to advise students to not drink at parties if they did not want to be raped on campus.

52.    None of the complaints brought to the attention of senior administrators by Plaintiff Doe —including those regarding David Shein, Bethany Nohlgren, Timand Bates,

Michele Dominy, Daniel Mendlesohn, and Nicholas Lewis— were ever addressed by the College.

140.    From 2009 to 2019, all but one of Bard's seventeen vice-presidents were White and there were no people of color *at all* in high-level positions or in "major admin" meetings.

141.    At least four of Bard's White Vice-Presidents graduated from Bard themselves and have not worked anywhere other than Bard. This includes: Max Kenner (Leon Botstein's son in law), Colleen Alexander, Stephen Tremaine, and Taun Toay. In every case, they were promoted to the "Vice President track" without either a completed graduate degree or any external work experience.

142.    From 2009 to the beginning of 2018, no minority sat on Bard's Executive Committee, a committee that consisted of the chairs of each academic department.  This committee had final decision-making authority over the courses taught by faculty, which courses students could take, whether students could remain at the College, and whether students would be recommended for financial aid.

143.    The average tenure at Bard College for Black administrators, not including Plaintiff Doe herself, is three years.

144.    The average tenure for White administrators in Vice President positions or higher is three decades.

145.    Every current employee in the Dean of Students office is White.

146.    Every single employee in the Dean of Studies office, supervised by David Shein, is (and always has been) White. David Shein also supervised his own wife for more than a decade.

147.    The Bard College Faculty, as of 2022, is 95.7 percent non-underrepresented minorities; and only 4.39 percent underrepresented minorities.

*Jane Doe v. Bard College*                                        Civil Complaint

148.    In July 2020, Kahan Sablo, Bard's belatedly hired "Director of Inclusive Excellence," who left Bard after only two years in the post, acknowledged that microaggressions against people of color and implicit bias are common on Bard campus and that Bard had never adopted a formal policy on racial and ethnicity-based harassment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of 42 U.S.C. § 1981 —Hostile Work Environment Arising from Discrimination Based on Race and Color and Failure to Prevent Harassment from Occurring**

149.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

150.    42 U.S.C. § 1981 prohibits employers from creating a hostile work environment arising from discrimination based on a Plaintiff's race and color. Plaintiff worked at Bard based on an implied contract establishing her working relationship for Bard. In addition, Plaintiff was provided a written contract which was renewed on a regular basis providing terms of employment. Each of the contracts includes a promise to Plaintiff that she will not be subjected to harassment or discrimination based on her race or color.

151.    Defendant's conduct, as alleged, violated 42 U.S.C. § 1981. Plaintiff was subjected to a hostile work environment because of her race and color.

152.    Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Defendant subjected Plaintiff to harassment motivated by Plaintiff's race and color (African American). This conduct included use of the N-word and other disparaging remarks as detailed above. Defendant also directed tangible

38

employment actions at Plaintiff that were designed to get her to resign or create a pretext for terminating her employment. Bard's termination of Plaintiff on March 3, 2021, was another act of harassment;

- Defendant's conduct was not welcomed by Plaintiff as she is highly offended by use of the N-word and other racial terms;

- Defendant's conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive;

- Plaintiff believed her work environment was hostile or abusive as a result of the Defendant's conduct;

- As a result of the hostile work environment, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status such as discharging, barring, refusing to transfer, failing to promote, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, on the basis of Plaintiff's race;

- Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race and color, failing to fully communicate the policy to its employees, failing to provide a reasonable way for Plaintiff to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by Plaintiff;

- Defendant Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black students;

- Bard College subjected Plaintiff to harassment due to her race and color and because she opposed the harassment of students due to race and color;

- Harassing Plaintiff and/or creating a hostile work environment in whole or in part on the basis of Plaintiff's race and color;

*Jane Doe v. Bard College*                                          Civil Complaint

- Defendant Bard College was deliberately indifferent to the risk that members of its staff harassed Plaintiff, retaliated against her, and subjected her to a hostile work environment due to her race and color.

153.   Defendant acted upon a continuing course of conduct such that the continuing violation doctrine applies. Despite the ongoing pattern of harassing conduct, Plaintiff continually believed that she was going to change the offensive conduct by staying at Bard.

154.   Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race and color harassment, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment. Plaintiff reported numerous instances of conduct that violated section 1981, but Defendant failed to investigate these complaints and the harassment continued. Similarly, Plaintiff reported harassing conduct directed towards her, and Defendant failed to investigate those complaints. Plaintiff is entitled to all available compensation under the 42 U.S.C. § 1981.

155.   As a proximate result of defendants' unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

156.   As a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

157.   As a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

*Jane Doe v. Bard College*                                    Civil Complaint

158.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

159.    Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and by ignoring and continuing to employ the harassers, Bard ratified the conduct of the harassers.  Bard's conduct therefore entitles Plaintiff to punitive damages against Defendant.

## SECOND CAUSE OF ACTION

### Violation of Title IX, 20 U.S.C. § 1681 – Retaliation

160.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

161.    Plaintiff is a female lesbian who was, at all times relevant herein, employed by Defendant Bard College.

162.    Title IX, 20 U.S.C. § 1681 provides that, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

163.    Upon information and belief, at all times relevant to this action, Defendant Bard College received and continues to receive Federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

164.    Defendant Bard College owed a duty to protect Plaintiff, a Professor and Administrator employed by Bard College, from gender-based discrimination, including discrimination based on sexual orientation, retaliation and a hostile work environment.

41

165.     Defendant Bard College discriminated against Plaintiff by subjecting her to different treatment on the basis of her sexual orientation including by subjecting her to an investigation that included claims that she created a "hypersexualized" environment though she was not accused of any inappropriate conduct.

166.     Defendant Bard College discriminated against Plaintiff by subjecting her to retaliation for reporting sexual harassment and assault of students on campus and supporting students seeking Title IX accommodations from Defendant Bard College.

167.     Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be retaliated against and subjected her to a hostile work environment.

168.     Defendant Bard College was deliberately indifferent to the risk that members of its staff did not take sexual assault and harassment seriously and would retaliate against employees for reporting alleged sexual assault and harassment and/or supporting students who had been the victims of sexual assault.

169.     In light of the continuing and ongoing, severe, and pervasive nature of the retaliation and hostile work environment Plaintiff suffered, Bard College's unlawful conduct as alleged herein constituted a single continuing violation of Title IX.

170.     Plaintiff is entitled to all available compensation under Title IX, 20 U.S.C. § 1681.

171.     As a proximate result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

*Jane Doe v. Bard College*                    Civil Complaint

172.    As a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

173.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

174.    As a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

## THIRD CAUSE OF ACTION

**Violation of New York State Human Rights Law – Race, Color, Gender, and Sexual Orientation Discrimination**

175.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

176.    The New York Executive Law §296(1)(a) provides that, "It shall be an unlawful discriminatory practice: (a) For an employer or licensed agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse or hire or employ or to bar or to discharge from employment such individual in compensation or in terms, condition or privileges of employment."

177.    Plaintiff is a Black, female lesbian who was, at all times relevant herein, employed by Defendant Bard College.

*Jane Doe v. Bard College*                                    Civil Complaint

178.   Defendant Bard College is an educational institution as defined by New York Executive Law §292(37).

179.   Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Defendant Bard College discriminated against Plaintiff by subjecting her to different treatment on the basis of her race, color, gender, and sexual orientation;

- Plaintiff, an African American woman, was treated differently from other similarly situated employees of different races/ethnicities;

- Defendant Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Jane Doe to file a complaint against the College;

- Defendant Bard College discriminated against Plaintiff by subjecting her to different treatment on the basis of her race, gender, and sexual orientation;

- As a result of discrimination, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status such as discharging, barring, refusing to transfer, failing to promote, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, and sexual orientation;

- Defendant Bard College subjected Plaintiff to harassment due to her race, color, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;

- Failing to take all reasonable steps to prevent discrimination, harassment, and

44

retaliation based on Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Plaintiff's race, color, gender, sexual orientation, and/or good faith complaints protected by the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a), were motivating factors in Defendants' decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ Plaintiff in any position, and/or to take other adverse job actions against Plaintiff.

180.    Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

181.    Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

182.    Under the New York State Human Rights Law, as a proximate result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

183.    Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

184.    Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

*Jane Doe v. Bard College*                                          Civil Complaint

185.     Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

186.     Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles Plaintiff to punitive damages against Defendants.

## FOURTH CAUSE OF ACTION

### Violation of New York State Human Rights Law - Retaliation

187.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

188.     The New York Executive Law §296(7) provides that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

189.     Defendant Bard College is an educational institution as defined by New York Executive Law §292(37).

190.     Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendants committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec.

46

Law § 296(7);

- Retaliating against Plaintifff for seeking to exercise rights guaranteed under the New York State Human Rights Law, and/or Defendants' race, color, gender, and sexual orientation discrimination, opposing Defendant's failure to provide such rights, and/or the right to be free of discrimination, in violation of the New York State Human Rights Law § 296 (7);

- Defendant Bard College retaliated against Plaintiff because of her complaints of discrimination on the basis of her race, color, gender, and sexual orientation;

- Defendant Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Jane Doe to file a complaint against the College;

- Defendant Bard College subjected Plaintiff to harassment due to her race, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;

- Harassing Plaintiff and/or creating a hostile work environment in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Plaintiff's race, color, gender, sexual orientation, and/or good faith complaints protected by the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a), were motivating factors in defendants' decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ Plaintiff in any position, and/or to take other adverse job actions against Plaintiff;

*Jane Doe v. Bard College*                                    Civil Complaint

- Defendant Bard College was deliberately indifferent to the risk that members of its staff harassed Plaintiff, retaliated against her, and subjected her to a hostile work environment.

191.    Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

192.    Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

193.    Under the New York State Human Rights Law, as a proximate result of Defendants' unlawful conduct, plaintiff is entitled to compensatory damages in an amount according to proof.

194.    Under the New York State Human Rights Law, as a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

195.    Under the New York State Human Rights Law, as a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

196.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

*Jane Doe v. Bard College*                                                  Civil Complaint

197.    Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendants.

**FIFTH CAUSE OF ACTION**

**Violation of New York State Human Rights Law —
Hostile Work Environment Arising from
Discrimination Based on Race, Color, Gender, and
Sexual Orientation**

198.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

199.    The New York State Human Rights Law prohibits employers from creating a hostile work environment arising from discrimination based on a Plaintiff's membership in a protected class.

200.    The New York Executive Law §296(1)(h) provides that, "It shall be an unlawful discriminatory practice for an employer to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, status as a victim of domestic violence, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims."

201.    Defendant's conduct, as alleged, violated the New York State Human Rights Law, including N.Y. Exec. Law § 296(1)(h).  Plaintiff was subjected to a hostile work environment because of her race, color, gender, and sexual orientation.

202.    Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Jane Doe to file a complaint against the College;

- Bard College subjected Plaintiff to harassment due to her race, color, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;

- Harassing Plaintiff and/or creating a hostile work environment in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(h);

- As a result of the hostile work environment, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status such as discharging, barring, refusing to transfer, failing to promote, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, and sexual orientation;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on, Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Defendant Bard College was deliberately indifferent to the risk that members of its staff harassed Plaintiff, retaliated against her, and subjected her to a hostile work environment.

203.    Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

204.    Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

205.    Under the New York State Human Rights Law, as a proximate result of Defendants' unlawful conduct, plaintiff is entitled to compensatory damages in an amount according to proof.

206.    Under the New York State Human Rights Law, as a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

207.    Under the New York State Human Rights Law, as a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

208.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

209. Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendants.

## SIXTH CAUSE OF ACTION

### Defamation – Slander Per Se

210. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

211. Following Plaintiff's March 3, 2021 termination, Defendant Bard College made several false statements about Plaintiff to her prospective employers. Plaintiff is informed and believes that these false statements related to Plaintiff's competence as a teacher. Plaintiff is informed and believes that these false statements were made with malice to vex and annoy Plaintiff and prevent her from getting alternative employment.

212. Defendant Bard College knew or should have known, when made these statements, that they were false.

213. Defendant Bard College made these statements without reasonable care as to the truth or falsity of the statements, and with the intention of causing injury to Plaintiff's reputation in her profession.

214. Defendant Bard College's defamatory statements were not protected by any privilege.

215. As a result of Defendant Bard College's false statements, Plaintiff has suffered injury to her personal, social, and professional reputation.

216. As a proximate result of Defendants' unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

*Jane Doe v. Bard College*                    Civil Complaint

217.   As a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

218.   As a proximate result of Defendants' willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

219.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

220.   Defendants' conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Jane Doe, respectfully requests that this Court grant the following relief against Defendant:

a.   For an award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and economic damages;

b.   For an award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and compensatory damages, including compensation for Plaintiff's emotional distress;

c.   For compensatory damages according to proof;

d.   For general and special damages according to proof;

e.   For exemplary damages according to proof;

f.   For pre-judgment and post-judgment interest on all damages awarded;

g.   For reasonable attorneys' fees;

*Jane Doe v. Bard College*                                        Civil Complaint

h. For costs of suit incurred;

i. For an award of lost wages in an amount to be determined at trial;

j. For an award of punitive damages in an amount to be determined at trial;

k. For an award of pre-judgment interest on all amounts due;

l. For such other and further relief as the Court may deem just and proper.

Dated: August 25, 2022.                    Respectfully Submitted,

                                          **STRATEGIC ADVOCACY CLINIC**
                                          **YALE LAW SCHOOL\***


                                          By:

                                                 Avery Gilbert
                                                 127 Wall St.
                                                 New Haven, CT 06511
                                                 (203) 432-2198
                                                 Email: avery.gilbert@yale.edu

**LAW OFFICE OF AVERY P. GILBERT**          **California Civil Rights Law Group**
Avery Gilbert                               Lawrence Organ (Pro Hac Vice Application)
Zachary Bendiner                            Zarinna Ozari
15 Shatzell Avenue                          332 San Anselmo Avenue
Suite 232                                   San Anselmo, CA 94960
Rhinecliff, NY 12574                        (415) 453-4740
(845) 380-6265                              Email: larry@civilrightsca.com
Email: avery@agilbertlaw.com                Email: zarrina@civilrightsca.com
Email: zbendiner@agilbertlaw.com

*Attorneys for Plaintiff*

*Jane Doe v. Bard College*                                Civil Complaint

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 25, 2022.                    Respectfully Submitted,

                                           **STRATEGIC ADVOCACY CLINIC**
                                           **YALE LAW SCHOOL\***

                                           By:

                                                 Avery Gilbert
                                                 127 Wall St.
                                                 New Haven, CT 06511
                                                 (203) 432-2198
                                                 Email: avery.gilbert@yale.edu

**LAW OFFICE OF AVERY P. GILBERT**          **California Civil Rights Law Group**
Avery Gilbert                              Lawrence Organ (Pro Hac Vice Application)
Zachary Bendiner                           Zarinna Ozari
15 Shatzell Avenue                         332 San Anselmo Avenue
Suite 232                                  San Anselmo, CA 94960
Rhinecliff, NY 12574                       (415) 453-4740
(845) 380-6265                             Email: larry@civilrightsca.com
Email: avery@agilbertlaw.com               Email: zarrina@civilrightsca.com
Email: zbendiner@agilbertlaw.com

*Attorneys for Plaintiff*

\*This document has been prepared by a clinic operated by Yale Law School, but does not purport to present the school's institutional views, if any.

*Jane Doe v. Bard College*                                    Civil Complaint