

Cullen and Dykman LLP
80 State Street, Suite 900
Albany, New York 12207
T: 518.788.9440 | F: 518.689.9519

**NICHOLAS J. FASO**
**PARTNER**
DIRECT: (518) 788-4416
NFASO@CULLENLLP.COM

January 4, 2023

<u>**VIA ECF**</u>

Hon. Cathy Seibel
The Hon. Charles Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

     *Re:*    *Doe v. Bard College*, 7:22-cv-7258 (CS)

Dear Judge Seibel:

     We represent Defendant Bard College ("<u>Bard</u>") in the above-referenced action. We write to advise the Court that, although Plaintiff Ann Seaton ("<u>Plaintiff</u>") has purported to unilaterally discontinue this action by an undated notice filed on December 29, 2022 (ECF No. 44), Plaintiff is in violation of this Court's order, dated December 5, 2022, directing Plaintiff to file a Complaint redacting the names of certain non-party employees of Bard and adding Plaintiff's name (the "<u>December 5 Order</u>"). Plaintiff's failure to comply with this Court's order is prejudicial to Bard, notwithstanding Plaintiff's purported discontinuance, because implicit in this Court's December 5 Order was that it would also grant Plaintiff's request to seal the original version of the Complaint, as the relief granted would otherwise not protect the non-parties who were gratuitously named in the original Complaint.

     The December 5 Order also directed the parties "to meet and confer regarding any further redactions." As such, over the course of several weeks in December, the parties exchanged emails and proposed revised drafts of the Complaint. Ultimately, Plaintiff agreed to anonymize the names and titles of all non-parties in the Complaint, and Bard proposed that the parties meet and confer on January 3, 2022 to discuss Plaintiff's proposed revised complaint. On December 27, 2022, Plaintiff suggested that the parties meet and confer sooner, before the New Year (a difficult week for Bard as it was essentially closed for the holidays). Then, without notice to Bard, Plaintiff abruptly filed a Notice of Discontinuance on December 29, 2022. We recently learned that, on the same day, Plaintiff filed a nearly identical lawsuit against Bard in Supreme Court, Dutchess County captioned *Ann Seaton v. Bard College*, Index No. 2022-54149, which drops Plaintiff's federal claims and anonymizes the names of the non-parties.[1]

     Plaintiff's refiling in state court is an obvious case of forum/judge shopping. But what's worse is Plaintiff's gamesmanship in failing to comply with this Court's December 5 Order, effectively negating the relief Bard obtained in securing the removal of all non-party names from

---

[1] A copy of the state court Complaint is enclosed.



the Complaint. Indeed, although Plaintiff's state court complaint removes these non-parties' names, the unredacted Complaint in this action remains on the public docket and continues to needlessly damage the reputations of Bard and the non-parties. Compounding this problem, Plaintiff's counsel, the Strategic Advocacy Clinic, continues to publish and promote the original Complaint on its website, despite participating in the December 5, 2022 conference during which the Court called into question the propriety of identifying the non-parties in the Complaint.[2]

Based on the foregoing, Bard respectfully requests that this Court seal the original complaint in this action, direct Plaintiff's counsel to cease promotion of the original Complaint via their website and other means, and direct Plaintiff to file a Complaint in this action under her real name that removes the names of all non-parties in accordance with this Court's December 5 Order and the parties' subsequent agreement. Based on our conversation with Plaintiff's counsel yesterday, we understand that Plaintiff does not oppose sealing of the Complaint.

We thank the Court for its attention to this matter.

Respectfully submitted,

/s/ *Nicholas J. Faso*

Nicholas J. Faso

cc:      All counsel of record via ECF.

---

[2] https://law.yale.edu/studying-law-yale/clinical-and-experiential-learning/our-clinics/strategic-advocacy-clinic (last accessed January 4, 2023).

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS

-------------------------------------------------------------------X

ANN SEATON,

                         Plaintiff,

         -  against  -

BARD COLLEGE, a Non-Profit Educational
Institution,

                        Defendants.

-------------------------------------------------------------------X

Index No.:

**SUMMONS**

Date Index No. Purchased:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on the Plaintiff's attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after completion of service where service is made in any other manner than by personal delivery within the State. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

      Plaintiff designates Dutchess County as the place of trial pursuant to CPLR § 503 on the grounds that Defendant resides in Dutchess County.

Dated: December 29, 2022

Respectfully Submitted,

**STRATEGIC ADVOCACY CLINIC
YALE LAW SCHOOL\***

By:               _/s/ Avery Gilbert_

Avery Gilbert
127 Wall St.
New Haven, CT 06511
(203) 432-2198
Email: avery.gilbert@yale.edu

**LAW OFFICE OF AVERY P. GILBERT**
Avery Gilbert
Zachary Bendiner
15 Shatzell Avenue
Suite 232
Rhinecliff, NY 12574
(845) 380-6265
Email: avery@agilbertlaw.com
Email: zbendiner@agilbertlaw.com

**California Civil Rights Law Group**
Lawrence Organ (Pro Hac Vice)
Zarrina Ozari
Kira Brekke (Pro Hac Vice)
332 San Anselmo Avenue
San Anselmo, CA 94960
(415) 453-4740
Email: larry@civilrightsca.com
Email: zarrina@civilrightsca.com
Email: kira@civilrightsca.com

Case 7:22-cv-07258-CS    Document 45    Filed 01/04/23    Page 4 of 46

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS

------------------------------------------------------------------X

ANN SEATON,

Plaintiff,

- against -

BARD COLLEGE, a Non-Profit Educational
Institution,

Defendant.

------------------------------------------------------------------X

Case No.:

**COMPLAINT AND JURY TRIAL
DEMAND**

      Plaintiff Ann Seaton (hereinafter "Plaintiff Seaton" or "Seaton") by and through her attorneys, the Strategic Advocacy Clinic of Yale Law School, the Law Office of Avery Gilbert and the California Civil Rights Law Group, states as her complaint against Defendant Bard College (hereinafter "the College" or "Bard"), as follows:

## PRELIMINARY STATEMENT

    1.    Plaintiff Ann Seaton, a gay woman of color, received a doctoral degree in English and American Literature from Harvard University in 1998–the only Black woman to do so that year.  After a successful decade teaching at other institutions, she was hired by Bard College and, for the next dozen years, attempted to protect students and herself from an environment at Bard College so racist that a 2020 survey of Bard staff and faculty of color revealed that only one person of color employed at Bard believed Bard is a "good place for a person of color to work," *none* agreed that they were adequately compensated for their work, and 75% did not intend to remain at Bard for longer than two years.[1]

---

[1] *See* Professionals of Color Affinity Group, *POC Survey*, Bard (2020),
https://docs.google.com/presentation/d/1cZIEKkhd8t6tna8NQGjJtkrXNTpJIb5KtsdoLFNBfbs/mobilepresent?slide=id.ga0568beff7_0_580

2.    This case lays bare how Bard operated for years to protect senior faculty and administrators accused of racial harassment and sexual predation, while fostering a hostile environment for people of color on its nearly all-white Annandale campus.

3.    Bard's racist conduct was egregious. Bard professors and administrators instructed her "not to think so much of herself," called her "arrogant" "feral" and "high yellow sweetie," and unapologetically had her African American guests held at gunpoint by state police in the middle of the night.  Plaintiff Seaton reported each of these incidents to senior administrators. None were addressed. In her 10 years of employment, she was denied promotions and kept in a "visiting" faculty position, which is against Bard's own policy, while lesser-qualified White employees were promoted. Plaintiff Seaton was not allowed an electronic security lock on her department door like other Bard administrative offices despite the college knowing that she was being attacked for her race. Instead, she was investigated by the College for engaging students in difficult subjects of racial subjugation and for telling students about racist attacks she had experienced in the town of Red Hook, where Bard is located.

4.    Plaintiff Seaton was a sounding board and a place of refuge for students of color as they were frequently infantilized, discarded and discriminated against by other Bard faculty and administrators. For years, Plaintiff Seaton alerted Bard senior faculty and administrators of the discriminatory treatment she and students of color experienced, and of the College's inaction in addressing the complaints of students who bravely came forward with sexual assault and harassment allegations. Rather than responding to Plaintiff Seaton's efforts to protect students, Bard retaliated against her by denying her promotions, undermining her career, refusing to protect her against a violent student, conducting a sham investigation against her, and terminating her employment.

5.    Plaintiff Seaton seeks redress for these wrongs to force Bard to protect its students of color and faculty members who stand up for themselves and for victims' rights.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper under C.P.L.R.§301 and 302 because Defendant Bard is located in New York, resides in New York, conducts business in New York, and the acts and/or omissions giving rise to the causes of action alleged herein occurred in New York.

7.    Venue is proper in Dutchess County and this Court under C.P.L.R. §503 (a) because Defendant Bard resides in this County and a substantial part of the events and/or omissions giving rise to the cause of action alleged herein occurred in this county.

## PARTIES

8.    Plaintiff Seaton holds a Ph.D. in English and American literature from Harvard University. She was hired by Bard in 2009 as Associate Dean of Students, Director of Multicultural Affairs, and Visiting Assistant Professor.

9.    Throughout her time at Bard College, Plaintiff Seaton reported racial discrimination and workplace harassment directed at students of color, as well as her concerns that alleged sexual misconduct and professional misconduct by Bard administrators and faculty members were going unaddressed by the College.  In 2017, Plaintiff Seaton reported to senior Bard administrators that the College was not fulfilling its duties under Title IX in the actions it took regarding a Black female student who alleged she had been raped on campus. When that student later filed suit against Bard, Plaintiff was held responsible for the lawsuit and terminated by the College.

10.    Defendant Bard College is a private, nonsectarian college located in Annandale-on-Hudson, New York. Upon information and belief, the College receives federal financial assistance.

## FACTUAL ALLEGATIONS

### 1.    PLAINTIFF SEATON'S QUALIFICATIONS AND BACKGROUND

11.    Plaintiff Seaton's educational background is highly prestigious. She graduated from Wellesley College with honors in Comparative Literature in 1990, where she was a two-time winner of the Academy of American Poets Prize. She was a Mellon Fellow in Comparative Literature at Stanford University in 1990 and continued her Mellon Fellowship at Harvard University, where she was also a Graduate Prize Fellow. Plaintiff Seaton received her Ph.D. from Harvard in 1998 and was a Pembroke Fellow at Brown University from 1998 to 1999.

12.    From 1999 to 2000, she was an Assistant Professor of English Literature in a tenure-track position at Skidmore College. From 2000 to 2001, she was a fellow at Oxford University, researching Feminism and Enlightenment. From Fall 2000 to Spring 2004, she was a tutor and fellow at Harvard University in the Departments of Literature and Special Concentrations.

13.    From 2005 to 2009, Plaintiff Seaton was Assistant Professor of English on a tenure track at the City University of New York ("CUNY") where she received glowing teaching evaluations.

### 2.    BARD'S OPEN HOSTILITY TOWARD PEOPLE OF COLOR

#### i.    Bard High-Level Administrator Warns Plaintiff Seaton of "Hostility" Toward Black People, Her Tenure-Track Position is Suddenly Rescinded, the Predominantly White Faculty Calls Her "Arrogant"

14.    In 2008, Plaintiff Seaton, at the urging of her domestic partner at that time, Kim Barke, who lived close to Bard College, applied for a position at Bard College so that she could move from Brooklyn, New York and join her partner in Red Hook. During Plaintiff Seaton's employment interview on September 15, 2008, High-level Administrator 1 noted: "There's a tremendous amount of hostility toward Black people here at Bard."

15.     Plaintiff Seaton was orally offered a tenure-track faculty position in Literature as well as an administrative job as Dean of Multicultural Affairs and Associate Dean of Students.

16.     A Bard high-level administrator then told Plaintiff Seaton that the tenure-track position was being withdrawn because the Literature Department faculty thought she was qualified but "arrogant." Plaintiff Seaton was instead offered a non-tenure track role with lower pay, lower academic prestige, and heavier workload: Visiting Assistant Professor of Humanities, Director of Multicultural Affairs, and Associate Dean of Students.

17.     Plaintiff Seaton, who already held a tenure-track faculty position within CUNY, was bewildered by this bait-and-switch. While she was still considering whether to counter-offer, continue to negotiate, or refuse the offer outright, Bard pre-emptively, before she had accepted the demoted position, announced Plaintiff Seaton's hiring on their website, putting her in an untenable position with her then-employer. A human resources administrator at CUNY confronted Plaintiff Seaton, leaving her with little recourse but to accept the Bard position on the new, lesser terms offered.

18.     A high-level administrator at Bard warned her that "Black people don't stay at Bard" because Black people are "more urban" and would not "enjoy" the rural setting of Bard.

19.     Plaintiff Seaton dutifully and ably performed her work. She invented the College's Difference and Media Project (DMP), which provided a space at Bard to educate the student body on issues of race, gender, sexual orientation and power, organizing more than 50 events per year. The Difference and Media Project was lauded by Bard as a "major institutional development" and considered a key part of its diversity work necessary to maintain its status as a credentialed academic institution. In addition to running the DMP, Plaintiff Seaton taught a First Year Seminar, an advanced, interdisciplinary seminar, titled "Race and the Pastoral," – designed in part as a

response to the ignorant and racist comments made to her up until that point and as an investigation of why the area around Bard was so lily-white – a graduate curatorial studies class, and dozens of other classes in Critical Theory, Gender Studies and Classics. Plaintiff Seaton consistently received glowing reviews from students.

20.    During her time at Bard, Plaintiff Seaton continued to be invited to prestigious institutions, including the University of Pennsylvania, Harvard, Princeton, and NYU, to address the student body and faculty of those institutions. Her work as an artist was featured in museums and galleries internationally and covered by the New York Times and Art Forum.

### ii.    Plaintiff Seaton and Other Black Faculty and Administrators Faced Discriminatory Employment Practices

21.    Despite her impressive career, in her more than ten years at Bard, Plaintiff Seaton never received a promotion, was never given an opportunity to pursue tenure and was kept in a "visiting" position in violation of Bard's policy of limiting "visiting" faculty to seven years. Meanwhile, White administrators who had lesser qualifications, including some whom the College knew to have a history of racism or sexual misconduct allegations, were promoted above her. This includes High-level Administrator A, a good friend of Bard's President, who was promoted despite being the subject of numerous complaints of alleged misconduct reported to senior administrators over the years, including verbal harassment, sexual harassment, sexual assault, racism, and homophobia.

22.    White administrators in positions comparable to Plaintiff Seaton were all provided administrative assistants to facilitate their work. Plaintiff Seaton was not.

23.    When Bard has hired Black employees over the years, they were almost invariably low-level hires who left Bard within a few years because of the toxic, hostile work environment and lack of equity, relative to their similarly-situated White peers, in promotion opportunities.

When Bard did hire Black employees with advanced degrees for director positions or deanships, the vast majority would leave soon after they arrived. The narratives of those former faculty members are eerily similar: Bard systemically made them, as people of color, feel unsupported, disregarded, and degraded.

24.    A survey of Bard staff and faculty of color completed in 2020 confirmed that only one person of color employed at Bard believe Bard is a "good place for a person of color to work," *none* agreed that they were adequately compensated for their work, and 75% did not intend to remain at Bard for longer than two years.[2]

25.    Plaintiff Seaton regularly brought people of color to give talks and share scholarship at Bard in hope of a post when Bard was hiring. None were hired at Bard, despite their impressive qualifications. Many were hired by other colleges and universities (Princeton, for example.)

### 3.    PLAINTIFF SEATON ADVOCATES FOR STUDENTS AND ENDURES A CONTINUOUS HOSTILE WORK ENVIRONMENT

26.    Plaintiff Seaton worked to end the racism endemic at Bard that disadvantaged students of color, created a hostile work environment, and prevented her from being promoted.

#### i.    Plaintiff Seaton Complains that Bard Reported Inflated Diversity Data, Bard Ignores Her and Denies Her Future Access to the Data

27.    In 2009, as part of a grant application to the Hearst Foundation, Bard falsely claimed to have 169 Black students enrolled at the school— approximately three times the actual

---

[2]*See* Professionals of Color Affinity Group, *POC Survey*, Bard (2020), https://docs.google.com/presentation/d/1cZIEKkhd8t6tna8NQGjJtkrXNTpJIb5KtsdoLFNBfbs/mobilepresent?slide =id.ga0568beff7_0_580

number. Plaintiff Seaton was extremely disturbed and upset by the inclusion of plainly erroneous data that invented Black students that did not exist, and notified the Committee of the inflated numbers, yet the report was signed off on by numerous Bard higher-ups. Bard received $300,000 from the Hearst Foundation, based in part on the reporting of false and inflated numbers of Black students.

28.     Plaintiff Seaton created several reports for Bard's senior administrators that clearly showed this data was incorrect. In response, rather than correct the reported data, Bard administrators refused to allow Plaintiff Seaton future access to the relevant data, which she needed to do her job as the Director of Multicultural Affairs.

> ### ii.     Minority Students are Funneled into a Program Partially Segregated from the Rest of the Student Body

29.     Plaintiff Seaton worked tirelessly to address institutional racism at Bard and the staggering fact that when Plaintiff Seaton arrived at Bard College, less than fifty percent of the students of color (Black and Latino) were able to graduate from the College in four years.

30.     Plaintiff Seaton attempted to address student concerns that the College's Bard Education Opportunity Program ("BEOP") was stigmatizing and hindering the advancement of students on financial aid. BEOP was a program that Bard marketed as giving certain students— who were predominantly students of color—financial aid at Bard.  The program, however, also stigmatized students, most of whom were minorities, by, for example, requiring them to use textbooks loudly labeled "BEOP," publicly identifying them as students in need of financial aid, or as Bard's own website currently proclaims, "people who do not possess the financial means to afford a college such as Bard."[3] The shame of carrying textbooks marking them as "poor" resulted

---

[3] Bard Equity and Inclusion Programs and Scholarships, https://www.bard.edu/dei/programs/bop/ (last visited Dec.19, 2022).

in BEOP students often attending class without their textbooks. BEOP students, now called BOP students, are currently described on Bard's own website not as part of Bard but as separate and other "nontraditional" "scholars" "benefitting from the Bard experience"[4] were required to satisfy additional criteria that non-financial-aid students did not have to satisfy, including by attending weekly classes in a basement on campus, to address the racist preconceptions that, for example, low-income students universally needed instruction on "time management." These students were often also required to be on work-study as part of their financial aid. The additional burdens made it difficult for BEOP students to attend to their degree coursework.

31.    Plaintiff Seaton repeatedly brought to Bard's attention that the BEOP program, by treating BEOP students as less able than non-financial aid students and by imposing additional requirements on them that non-BEOP students did not have to satisfy, was crippling the ability of students on financial-aid, primarily students of color, to complete their degrees.

32.    BEOP students also complained about faculty to Plaintiff Seaton. Specifically, one of BEOP's White directors was known to be hostile toward students and administrators of color. Students complained that this director seemed angry and resentful when Black students succeeded academically. Plaintiff Seaton was informed that under Bard's White BEOP leadership, a BEOP event was held featuring watermelon, Kool-Aid, and fried chicken, offending and embarrassing the BEOP students.

33.    Plaintiff Seaton reported numerous student complaints to Bard administrators capable of taking action to address the complaints, yet no action was taken and no policy to address racism on campus was adopted.

---

[4] *Id.*

34.     BEOP staff of color, working primarily under White-identified directors, were known to leave Bard shortly after starting due to the hostile work environment. Each BEOP assistant director complained to Plaintiff Seaton that they felt verbally demeaned by Bard faculty due to their race, that they were not taken seriously and not allowed to express their ideas. They said they also saw students of color being treated in disparaging and unprofessional ways, which they felt powerless to stop due to the institutionally accepted racism. Between 2012 and 2017, three BEOP assistant directors—two Black and one Afro-Latino—were hired and quickly left. Two of those Black administrators left within a year of being hired. One of those Afro-Latino administrators went on to a highly successful position as Dean of Students at NYU, while another is now completing a PhD.

35.     In 2013, Plaintiff Seaton recommended that Bard hire an African-American teacher experienced with at-risk students to work with BEOP. Instead, White administrators continued to oversee BEOP despite multiple reports of harassment against Black students and administrators, and that students of color were facing institutional barriers to academic success founded in racist preconceptions of segregation and infantilization. As another suggestion, Plaintiff Seaton urged Bard administration to address the situation by moving the BEOP reporting to a new "Dean of Inclusive Excellence."

36.     In 2014, Plaintiff Seaton again urged a Bard high-level administrator to address racism and racial segregation on campus and expressed her concern that students of color at Bard in Posse (a national non-profit dedicated to college access for students of diverse backgrounds) and BEOP were facing institutional barriers to academic success founded in racist preconceptions.

37.     Non-BEOP students of color at Bard are also often treated with suspicion and as less capable, as mentioned by a recent film made by Bard alumna Rebecca Huntt, "Beba," in which Plaintiff Seaton appears.

38.     Because of this institutional segregation and racism, as well as a chaotic administrative turbulence, BEOP and other students of color often sought refuge in the DMP project that Plaintiff Seaton created.

39.      Unlike the rapid turnover in BEOP, with administrators coming and going, Plaintiff Seaton was at Bard for 12 years, longer than virtually any Black Bard director-level administrator in the history of the college. These students spoke of their frustrations about being treated disparagingly.

40.     In November 2015, Bard students, including Difference and Media Project students, organized and held a protest, Black Out Bard, in opposition to racism at the College with the goal of addressing racial discrimination on campus so that "Black students could go to class without fear." After the protest, in December 2015, in an email to Bard's high-level administrators, Plaintiff Seaton yet again implored administrators to address discrimination on campus.

### iii.    Plaintiff Seaton is Told that Black Students on Financial Aid Cannot Pursue Additional Majors

41.     Over the years, Plaintiff Seaton was told by multiple Black students on financial aid that the financial aid office refused to grant them the necessary financial aid to complete the degree they wanted and instead told them to "feel grateful" for what they had. They reported feeling demeaned and insulted.

42.     In 2014, one Black student, applying for a joint degree in Studio Art and Biology, was told that she "only needed one BA" and should "feel grateful for the aid she had already gotten."

43.     Plaintiff Seaton was concerned about what appeared to be different- and lesser-treatment of Black students and explained to Bard higher-ups that it appeared as though Black students on financial aid were being treated as though they were "not entitled to a Bard education in the same way that [White students] are" and that the "admonishment" of these students for seeking more financially lucrative degrees was "not a good public face for the institution."

### iv.   Plaintiff Seaton's Campus Guests are Held at Gunpoint in the Middle of the Night

44.     In 2009, the first year of Plaintiff Seaton's employment at Bard, she invited guests, both of whom are Black, to participate on a panel hosted by the DMP. The two guests were given Bard housing during their stay, as was a guest of Faculty Member A. Faculty Member A's guest saw Plaintiff Seaton's guests enter the Bard housing they were given. Evidently alarmed at the presence of Black people in the shared housing "turning on and off lights," Faculty Member A's guest called Faculty Member A and reported that there were Black people in the housing. Faculty Member A immediately told them to call the police. The state police responded to the scene, awoke Plaintiff Seaton's guests at gunpoint, and held them for several hours, interrogating them repeatedly through the middle of the night.

45.     Appalled, Plaintiff Seaton alerted Bard administration. This prompted Faculty Member A to call Plaintiff Seaton, screaming at her that he would make sure she lost her job over her complaint. Plaintiff Seaton reported this threatening call to Bard administration. No action was taken and no apology made to Plaintiff Seaton or her guests who remain traumatized by the horrifying experience. Plaintiff Seaton bore the vicarious trauma and shame of having invited guests to Bard, to then have them held at gunpoint in the middle of the night.

### v.   High-Level Administrator B Demeans Plaintiff Seaton Due to Her Race, Advises Students to Avoid Schools with Black People

46.     Within Plaintiff Seaton's first weeks at Bard, two Bard administrators said they found Plaintiff Seaton to be "intimidating." High-level Administrator B went on to tell Plaintiff Seaton that Plaintiff Seaton reminded her of her adopted Black sister who had severe mental illness.

47.     Numerous Black Bard alumni, both men and women, have reported that High-level Administrator B also compared them to her adopted Black sister who, in High-level Administrator B's own words, "She is not in contact with and is afraid of."

48.      High-level Administrator B openly shared with students her own discomfort with Black people. In one instance in 2011, High-level Administrator B advised a student that he might feel uncomfortable transferring to the University of Chicago because it was in a neighborhood with many Black people. She asked this student to think about his comfort levels around people of color. That student immediately went to Plaintiff Seaton to report this. Plaintiff Seaton reported this to Bard high-level administrators many times. Her complaints were ignored.

49.     In another instance around the same time, High-level Administrator B informed a student that neither Plaintiff Seaton nor another faculty member of color were professors in the Human Rights Department and could not advise students in Bard's Human Rights Program. This was not true. Both Plaintiff Seaton and this other faculty member served as Human Rights Program advisors. Plaintiff Seaton reported this to two Bard high-level administrators. Her complaints were ignored.

50.     Students and families of color regularly told Plaintiff Seaton that High-level Administrator B treated them in a disparaging manner and that their drug and mental health problems were treated as criminal by High-level Administrator B, while White students with similar problems received support and care.

51.     In another instance, High-level Administrator B described a student of color as "verocious," a slang word commonly applied to animals to mean a cross-between ferocious and vicious.

52.     Despite these instances, many of which were reported to Bard senior administrators capable of taking action, Bard promoted High-level Administrator B.

### vi.     Faculty Member B Describes Plaintiff Seaton as "Feral"

53.     In 2009, Plaintiff Seaton taught a tutorial that she designed called "Race and the Pastoral," which proved exceedingly popular with students. Tutorials at Bard were electives that typically received little attention from established departments or administrators. Despite this, Plaintiff Seaton's tutorial was brought up at a Literature Department meeting and then at a meeting with Bard's Executive Committee, consisting of top administrators, all of whom were White.

54.     Faculty Member B, a White faculty member who was also a high-level administrator, invited Plaintiff Seaton to a meeting at the request of another faculty member. There, Faculty Member B disparaged Plaintiff Seaton, saying, "The problem is really that you can't teach in English, and you don't have the qualifications to teach in Social Studies. You don't have any real training.  And the thing is, the Literature faculty really are opposed to you doing any teaching there… ***The real problem is that your teaching is feral. It's feral. What you're doing is feral.***" Plaintiff Seaton, in fact, had plenty of training, culminating in a Ph.D. in English and American Literature and Language from Harvard, where she also taught courses in various disciplines, including Literature, History, and Medieval Studies. The real reason behind Faculty Member B's attack is revealed in her use of the word "feral," meaning savage beast, incapable of domestication. To Faculty Member B, Plaintiff Seaton was a wild Black woman who could not be trusted with enforcing the status quo racial hierarchy, and whose credentials should be dismissed out of hand. Plaintiff Seaton was shocked and humiliated.

### vii.   High-Level Administrator A Tells Plaintiff Seaton not to "Think So Much Of Herself," Discriminates Against Plaintiff Seaton's Black Students, Assaults Plaintiff Seaton's Partner

55.     In her first year at Bard, in 2009, while Plaintiff Seaton was walking to the campus center, High-level Administrator A accosted Plaintiff Seaton by blocking the sidewalk in a physically threatening manner. In a loud voice, he said, "You shouldn't think so much of yourself because of your pedigree!" Plaintiff Seaton immediately felt threatened and left the area; however, she did not, and could not, report this to her supervisor who appeared to be in a romantic relationship with High-level Administrator A at the time. In the office, the two were referred to as "mom and dad" by the other administrators.

56.     When Plaintiff Seaton eventually did report this frightening experience to her new supervisors, no investigation or discipline of High-level Administrator A followed.

57.     High-level Administrator A's hostility toward people of color also came across in his dealings with Plaintiff Seaton's students. High-level Administrator A ran the external fellowships program and regularly excluded highly-qualified students of color from fellowship nominations. Students complained to Plaintiff Seaton that High-level Administrator A discounted their applications and discriminated against them. Colleagues also told Plaintiff Seaton that High-level Administrator A was so hostile toward Black male students that they had had to intervene to remove crying students from his office.

58.     High-level Administrator A's hostility toward Plaintiff Seaton also extended to her partner. On April 10, 2010, while Plaintiff Seaton's partner was on crutches, High-level Administrator A violently yelled at her and threw his car keys at her because she had been slow to get to the driver's seat of her car after dropping off Plaintiff Seaton.  Plaintiff Seaton reported the altercation to her supervisors, one of whom laughed in her face. Plaintiff Seaton also informed another high-level administrator, who shrugged her shoulders and merely described High-level

Case 7:22-cv-07258-CS   Document 45   Filed 01/04/23   Page 19 of 46

Administrator A as a "drunk." Separately, High-level Administrator D made clear to Plaintiff Seaton that over the years, she had tried to remove High-level Administrator A from Bard for his misconduct but that he was untouchable due to his close relationship with other high-level administrators. There was no inquiry by Bard into this reported incident, nor was there any discipline or admonishment of High-level Administrator A for his egregious conduct that violated Bard's policy.

59.    The reporting structure at Bard was often changing. When, in 2014, Plaintiff Seaton began reporting to High-level Administrator C, she recounted to him the various hostilities and discriminations she had faced, in particular those at the hands of High-level Administrator A over the years, all of which resulted in no investigation. Though High-level Administrator C expressed sympathies, he told Plaintiff Seaton that if he complained about High-level Administrator A's behavior, High-level Administrator A's "lawyers would be all over [him]."

60.    With the arrival of a new dean in 2015, Plaintiff Seaton again recounted her experiences with discrimination and hostility at Bard. Again, no investigation was conducted.

**viii.    "As Soon As You Come Into A Room Here, It's as if You have Already Done Something Wrong."**

61.    One of the directors of Bard's Achebe Center told Plaintiff Seaton that he overheard faculty, in a group dynamic, saying disparaging things about Plaintiff Seaton due to her race, calling her, amongst other things, arrogant.

62.    When this director left Bard a few years after starting, he explained he left the College because as a Black person, he felt, "as soon as you come into a room here, it's as if you have already done something wrong."

**ix.    From 2012 To 2014, Plaintiff Seaton Again Observes Bard Treating Black Administrators Differently than Similarly-Situated Whites.**

63.     In 2012, Bard hired an Afro-Latino man as Assistant Director of BEOP. He announced his departure eight months later, telling Plaintiff Seaton that he found the environment at Bard to be oppressive and professionally demeaning. This individual went on to a successful career at the University of Vermont and then New York University.

64.     As a replacement, Bard hired another African-American man in 2013. A few months later, that individual told Plaintiff Seaton he was looking for a new job because he felt BEOP had a White-run abusive structure that replicated structural racism and handicapped students, which he felt powerless to change within the existing White-only reporting chain. He told Plaintiff Seaton that the work environment at Bard was so racist and hostile toward him that he could not remain.

65.     That individual was himself replaced by yet another Black administrator who also relayed to Plaintiff Seaton that Bard's environment was so hostile, toxic and racist that it made her physically unwell. This third person left within a few years as well.

> **x.     Bard Employee of Color Feels Monitored in Discussions with Other Black Administrators**

66.     In 2014, a Bard administrator of color wrote to Plaintiff Seaton that he was unable to have conversations with other administrators of color without being monitored, which he felt was a way to prevent him from forming relationships with other people of color. He said he "figured out" that Bard's "formula" was to "isolate all of the [people of color] so we don't band in unity." This same Bard administrator confided in Plaintiff Seaton that he experienced headaches, and felt hopeless and depressed due to the hostile work environment, and that a White supervisor said he would never be promoted or amount to anything.

> **xi.     Plaintiff Seaton Reports Physical Assault by Racist Student Known for Harassing Women of Color, Bard Takes No Action**

67.     On April 15, 2015, Student A stormed into Plaintiff Seaton's office unannounced shaking and screaming at the top of his lungs. He advanced toward her in a menacing way and backed her up against the wall screaming, "Harvard should never have given you a Ph.D. because you are a stupid idiot! You are a fucking moron! Why is Bard paying money for this?!" He apparently took issue with an art project that DMP sponsored that centered on racial discrimination. Plaintiff Seaton called someone in an adjacent office to come help her. The two reported the incident to High-level Administrator B. Nothing was done to provide Plaintiff Seaton with more safety, nor was she provided with a means for securing her office, which other faculty and professors were given.

68.     Concerned that Student A posed an ongoing threat to students of color, Plaintiff Seaton wrote to High-level Administrator B, "What worries me is I've also seen mania turn violent…. I asked [Student A's girlfriend] if [Student A] ever became violent and she burst into tears…… I'm also really concerned for [her]."  No one from Bard ever contacted Student A's girlfriend about her safety. Had someone done so, they would have learned that Student A had threatened to kill her the year prior, and that he stormed into Plaintiff Seaton's office because of his furor over her engagement in the Difference and Media Project, which confronted challenging racial dynamics.

69.     On April 21, 2015, Plaintiff Seaton reported to High-level Administrator B that there were "numerous reports coming into [her] about other students (of color, mostly) that feel harassed by Student A– the majority are also, worryingly, women– he's making people feel uncomfortable in classrooms and social settings as well as online." Bard did nothing to protect Plaintiff Seaton or vulnerable students from Student A. Plaintiff Seaton continued to ask for a card

key lock to her office, which other administrative offices had. Even as Plaintiff Seaton faced threats, Bard declined to ensure her safety.

70.     Instead, on information and belief, four years later, High-level Administrator B used knowledge of Student A's animus toward Black people to solicit complaints from him about Plaintiff Seaton, which, as described below, were themselves racist and part of an orchestrated investigation to get Plaintiff Seaton fired.

71.     In 2018, Plaintiff Seaton reported to High-level Administrator C that she had received emails from alumnus, Lauren Roe[5] ("Lauren"), threatening violence. Plaintiff Seaton was again never given additional security to her office. Instead, administrators later used Lauren's threats as an opportunity to launch a pretextual investigation against Plaintiff Seaton in retaliation for her engaging in protected activity, including reporting discrimination and harassment of female students and students of color and the failure of the College to provide Title IX accommodations to a Black female student.

### xii.     High-Level Administrator D Frequently Tells Plaintiff Seaton She Will Never Be Promoted Due to Her Race

72.     High-level Administrator D regularly advised Plaintiff Seaton to leave Bard because the institutional sexism and racism would prevent her from ever being promoted. Yet, High-level Administrator D perpetuated the toxic environment she ostensibly criticized. In 2014, Plaintiff Seaton reported to High-level Administrator D that she was being sexually harassed by a new employee, High-level Administrator E. Plaintiff Seaton reported that High-level Administrator E touched her and called her "high yellow sweetie." High-level Administrator D told Plaintiff Seaton that High-level Administrator E had a close relationship with High-

---

[5] Lauren Roe is a fictious name to protect the identity of the individual due to privacy concerns.

Administrator 1 who wanted to see this employee advance in his career. High-level Administrator D nonetheless emailed a Bard administrator who then contacted Plaintiff Seaton to discourage her from bringing a Title IX complaint. Bard undertook no investigation of High-level Administrator E, and he was later promoted to a high-level administrator position.

73.     High-level Administrator D regularly made hostile comments about the few people of color on the faculty, including by saying they had "poor judgment." Worse, whenever there was a faculty position opening, High-level Administrator D would complain aloud that there was "no way to find qualified candidates of color." Plaintiff Seaton could not believe this, particularly because she regularly brought people of color to give talks and share scholarship at Bard in hope of a post. None were hired at Bard, despite their impressive qualifications. Many were hired by other colleges and universities (Princeton, for example).

74.     In High-level Administrator D's long tenure at Bard, only two Black professors received tenure. In the STEM and English departments, there were no Black tenured professors at all. At present, there has never been a single Black tenured professor in most of Bard's academic departments and across entire divisions.

**xiii.     White Professor Calls Asian Students Superior to Black Students**

75.     In 2015, Plaintiff Seaton participated on a board of professors reviewing a project by a Black student during which a White professor referred to Asian students as superior to Black students.

**xiv.     Plaintiff Seaton is Threatened to Not Complain About Hostile Acts Against Her**

76.     In 2016, Plaintiff Seaton was informed that there had been a Black dean at Bard whom High-level Administrator A referred to as "a bitch." When this former dean complained

about the incident at the time, High-level Administrator A said the former dean was pushed out and made to feel so uncomfortable that he was forced to leave.

### xv. Bard Keeps a Violently Smashed Bust of Obama Inscribed with "Fuck Obama!" in a Public Space

77.    Also in 2016, Plaintiff Seaton was made aware of a smashed bust of President Obama, which was inscribed with "Fuck Obama!" that was left in a public building adjacent to Bard administrative offices. As a Black woman, Plaintiff Seaton felt personally attacked by the violence done to a bust of the nation's first Black president. Despite informing Bard high-level administrators, the bust was not removed for several months.

### xvi. Bard Refuses to Interview a Black Physics Professor, Tells Plaintiff Seaton that "No Black Physics Student Has Ever Graduated from Bard College"

78.    In 2016, Bard refused to allow a Black physics scholar to visit the campus for an interview, telling Plaintiff Seaton that Bard had never graduated a Black physics student. Plaintiff Seaton was given the impression that Bard did not want this physicist to visit because it did not want to encourage students of color to pursue physics.

### xvii. Bard Refuses to Promote Plaintiff Seaton

79.    In 2012, Plaintiff Seaton developed an "Assistant Dean for Inclusive Excellence" position, which she envisioned as a new, higher-salaried job that would promote inclusivity and diversity at Bard. With encouragement from High-level Administrators C and D, Plaintiff Seaton worked diligently to continue refining and developing the position, and she was continuously told she was "definitely" going to get a promotion and raise. Plaintiff Seaton continued to work on the proposal for the next few years, with no action from Bard.

80.    Four years later, in 2016, Bard finally staffed the "Dean of Inclusive Excellence" post, but, rather than hiring Plaintiff Seaton, the job was given to a non-African-American Bard alumnus who was less qualified than Plaintiff Seaton and who had also signed-off on Bard's

reporting of false diversity data to the Hearst Foundation in 2009, described *supra*. Plaintiff Seaton did not receive a promotion.

81.     In 2017, Plaintiff Seaton again complained about Bard's failure to promote her after eight years of employment. High-level Administrator C promised her a raise. Plaintiff Seaton *never* received the promised raise or promotion.

### xviii.   Bard Refuses to Intervene when Plaintiff Seaton and Other People of Color are Sent Vile Emails Including, "What's Up N**Ger B**Ch"

82.     In 2018, Plaintiff Seaton and other Black people on campus received anonymous emails which read, ***"What's up n**ger b**ch," and "GO BACK TO AFRICA you f-ing C*NTS."*** Plaintiff Seaton reported this to administrators. While Bard apparently determined the sender was a Bard alum, it refused to disclose this person's identity to Plaintiff Seaton and others concerned, leaving them in the dark about their safety. No apparent action was taken against the sender, nor were any steps taken to protect Plaintiff Seaton or the targeted students of color at Bard. Plaintiff Seaton again did not receive a card key for her office door.

### xix.   Plaintiff Seaton is Racially Profiled in the Dining Hall, Bard Takes No Action

83.     On April 18, 2018, while Plaintiff Seaton was with a guest presenter whom she brought to campus, she was accused by foodservice workers of stealing food from the dining hall. Plaintiff Seaton was aggressively followed and yelled at. She immediately reported the incident to High-level Administrator C with a corroborating statement from her guest. No investigation was conducted or remedial action taken.

### 4.   BARD RETALIATES AGAINST PLAINTIFF SEATON FOR REPORTING TITLE IX VIOLATIONS, INCLUDING REPORTING DISCRIMINATION AGAINST A RAPE VICTIM

84.     In November 2015, Student Jane Doe[6], a Black student, informed Bard administration that she had been raped by a White male student in a Bard dorm. She requested that Bard administration issue a No Contact Order or remove the student from campus to protect her from further abuse. Bard refused. Student Doe then reported ongoing stalking and harassment by her abuser over the next six months, including repeated use of the N-word. She continuously requested a No Contact Order, to no avail.

85.     Only after a White female student reported that the same White male student had also raped *her* did Bard finally issue a No Contact Order for all alleged victims and finally launched an investigation in May 2016. Even though the male student was eventually expelled, Bard continued to neglect to provide accommodations or support for Student Doe. Instead, in a letter signed by Bard high-level administrators, Bard attempted to silence Student Doe by dismissing her from the college, telling her that she is not "Bard material."

86.     When Student Doe told Plaintiff Seaton of Bard's mishandling of her assault and its attempt to remove her from campus, Plaintiff Seaton brought the matter to the attention of High-level Administrator C who held meetings with Student Doe, usually with Plaintiff Seaton present. Plaintiff Seaton urged Bard to comply with the law in its response to allegations of sexual harassment and sexual assault on campus, and she vocally objected to Bard's focus on "damage control" to its public image rather than protecting students. Her complaints were communicated to Bard management.

87.     Despite this, Bard persisted in attempting to remove Student Doe from campus. On September 12, 2017, Plaintiff Seaton received an email from High-level Administrator B, telling her to "not encourage [Student Doe] to go to classes or be in classes this fall."

---

[6] Student Doe is a fictitious name used to protect the identity of the rape victim.

88.     In November 2017, appalled by Bard's flagrant and unacceptable failure to address allegations of sexual assault and sexual harassment on campus and provide Title IX accommodations, Plaintiff Seaton drafted a research-based administrative plan to address the troubling issues on campus. She shared it with High-level Administrator C noting, "I think we are better than this at Bard but it's time for us to really shift what we are doing." The two spoke about it extensively. Bard made no change.

89.     In September 2018, Student Doe filed a lawsuit against Bard for violating Title IX, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000, 504 of the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. 12101, and related New York State laws. The following day, High-level Administrator C called Plaintiff Seaton into his office and blamed her for the lawsuit, saying, "The college is extremely upset about this. This is extremely damaging," and aggressively asked, "Did you know anything about this?" and "Were you consulted in this matter?"

90.     Following Plaintiff Seaton's reporting to high-level management that Bard College was failing to provide Title IX accommodations to Student Doe—all protected activity under the New York State Human Rights Law—Bard administrators began retaliating against Plaintiff Seaton, including by undermining the Difference in Media Project (DMP) and raiding its budget.

91.     It was clear Bard was preparing to remove Plaintiff Seaton but knew firing her outright would be too blatantly retaliatory. **First**, Student Doe had recently filed her complaint, which Plaintiff Seaton supported and terminating Plaintiff Seaton so soon thereafter would be clear retaliation. **Second**, Bard had no justification for removing an employee who had never had poor reviews and who was trusted and relied upon by students. **Third**, Plaintiff Seaton had no record of violating any Bard policy. **Fourth**, from the initial filing of Student Doe's lawsuit until June 3,

2019, Plaintiff Seaton had significant academic responsibilities teaching courses, supervising senior projects, and organizing highly public and much-anticipated events, including one attended by 1,500 people in May of 2019.

92.     On May 21, 2019, in preparation for removing her from campus, Bard sent Plaintiff Seaton an email asking for a bullet point list of her job duties and any committees on which she had worked.

93.     On June 27, 2019, Plaintiff Seaton was asked to remove her things from her office.

94.     On July 18, 2019, a Bard high-level administrator announced that High-level Administrator C, who had also ended up supporting Student Doe, was abruptly demoted to visiting professor and put on a year sabbatical, removing him from campus.

95.     On July 30, 2019, Student Doe withdrew her lawsuit against Bard College.

96.     Just two weeks later, on August 16, 2019, while students were on summer break and without ever speaking to Plaintiff Seaton or doing a preliminary investigation, a Bard high-level administrator informed Plaintiff Seaton that she was suspended from campus and forbidden from contacting all students and alumni. Plaintiff Seaton was told that for the first time after nine years of employment without issue, there were all of a sudden multiple "complaints from students and alumni concerning [her] behavior." Plaintiff Seaton was not told what the complaints were.

97.     In suspending Plaintiff Seaton, Bard failed to follow the express terms of its Employee Handbook, which explicitly states that "[W]ith respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal warning; a next offense may be followed by a written warning; another offense may lead to a suspension; and, still another offense may then lead to termination of employment."

98.     The Faculty Handbook specifies that "In the event of the suspension or dismissal of a teacher (in any category) before the expiration of his or her contract, consultation, a written statement of reasons, and the opportunity for a hearing under Article V will be accorded. It is understood that the President bears the burden of proof in procedures governed by Article V."

99.     For the next year and a half, Bard Trustee A, a close ally of Bard's president, directed an invasive, pretextual investigation against Plaintiff Seaton for the purpose of finding a reason to terminate her employment. The investigation was itself infected with racism, sexism and homophobia. Though Bard created a façade of impartiality by hiring an "outside" attorney, Bard Trustee A called the shots. For example, at Bard Trustee A's direction, Bard's outside counsel refused to allow Plaintiff Seaton to see the alleged complaints made against her or record an interview conducted with her.

### i.     The Year-And-A-Half Sham Investigation Against Plaintiff Seaton

100.     As time wore on, it became apparent that no complaints from "students" had been made. Instead, on information and belief, Bard administrators had *themselves elicited* complaints from two alumni. The first, Lauren Roe, an alumnus who had graduated years prior and whom High-level Administrator B knew suffered from severe mental instability, was not credible, and had made threats against Plaintiff Seaton in the past. The second, Student B, another alumnus who had very little contact with Plaintiff Seaton as a student but was working with a Bard high-level administrator and, upon information and belief, was *asked* by Bard to complain about Plaintiff Seaton. And, later, a third was elicited from Student A, the student who, the administration knew had attacked and racially harassed Plaintiff Seaton in her office years before and who alleged Plaintiff Seaton was "lying" when she told students that she was chased and called the "n" word in lily white Red Hook, New York where Bard is located.

Case 7:22-cv-07258-CS   Document 45   Filed 01/04/23   Page 30 of 46

101.    During the course of the "investigation" Plaintiff Seaton was forced to respond to racist and homophobic allegations, including: that a photo shoot one of her students did was "inappropriate" because it engaged difficult questions of racial subjugation; that Plaintiff Seaton, by simply being a gay woman, created a "hypersexualized" environment though no specific "hypersexualized" words or conduct were ever alleged;  and that Plaintiff Seaton was lying when she related to students her personal experiences of racial hostility in Red Hook, New York. Plaintiff Seaton was also forced to endure the humiliation of suspension from campus for nineteen months while Bard launched a wide-ranging investigation in an attempt to uncover a plausible reason for firing her.

102.    No reason to terminate Plaintiff Seaton could be found. Nineteen months after Plaintiff Seaton was suspended without notice from campus, on March 3, 2021, Bard sent a "notice of outcome letter" to Plaintiff Seaton, notifying her of the outcome of the investigation. The investigator had not found sufficient evidence of any offense worthy of termination.

103.    On information and belief, the investigator did not recommend that Plaintiff Seaton be terminated.

104.    The "investigation" was not designed to determine whether Plaintiff Seaton posed a threat to students but rather served as a pretext to terminate her and was itself an act of workplace harassment in requiring her to answer, not for any allegedly wrong acts, but for being a gay Black woman at a nearly all-white school in a nearly all-white town.

**ii.    Bard Terminates Plaintiff Seaton's employment**

105.    On March 3, 2021, nineteen months after launching the pretextual investigation, Bard terminated Plaintiff Seaton's employment.

//
//

5.      **BARD HAS A PATTERN AND PRACTICE OF RACIAL DISCRIMINATION**

106.    Bard College is required to submit periodic reports to the Middle States Commission on Higher Education to operate as an accredited college.

107.    One of the standards that Bard must meet for accreditation is Standard II, "Ethics and Integrity." To meet that standard, the Middle States Committee on Higher Education requires its accredited Colleges to "possess and demonstrate" a climate that "fosters respect among students, faculty, staff, and administration from a range of diverse backgrounds, ideas and perspectives."

108.    In 2007, the "Integrity Committee" of Bard's "self-study" included in Bard's report to the Middle States Commission the "action point" that an "often-mentioned need among community members is the need for regular orientation for new administrative and staff hires, especially new managers, and particularly in such highly regulated areas as sexual harassment and intervention."

109.    Bard did not, between 2009 to 2019, require staff or faculty to complete any racial harassment or racial bias training, despite the many complaints of which the College was aware, the extremely high turnover of Black staff and faculty and the low graduation rates of students of color.

110.    The Middle States Committee on Higher Education also requires accredited institutions to "possess and demonstrate" a "grievance policy that is documented and disseminated to address complaints or grievances raised by students, faculty, or staff" and that the policies and procedures be "fair and impartial" and grievances "addressed promptly, appropriately, and equitably."

111.    In 2007, because Bard lacked the impartial grievance procedure required for accreditation, the Integrity Committee recommended, as part of its accreditation reporting, that

Bard appoint an ombudsperson trained in conflict resolution because "the community could benefit from the establishment of a confidential and impartial counseling process" instead of having "grievances resolved by the Office of the Vice President for Administration."

112.    Despite this clear recommendation and accreditation requirement, Bard did not appoint an ombudsperson or establish a "fair and impartial" grievance process. Instead, five years later, a Bard high-level administrator wrote in the Periodic Review Report to Middle States that Bard was *still* "considering" appointing an ombudsperson.

113.    To date, Bard has never appointed an impartial ombudsperson and Bard high-level administration continues to control personnel decisions. Bard's governance structure is instead intentionally designed to insulate friends of Bard's administration from accountability.

114.    Three federal complaints were launched against the College for its failure to address allegations of sexual harassment on campus. In an open house event referred to in a 2015 complaint, three students reported that a High-level Administrator 1 told them it was not the College's role to police the personal lives of students, and, horrifyingly, that sexual assault would happen in students' personal lives. Students were then allegedly advised to not drink at parties if they did not want to be raped on campus.

115.    Over the years, Plaintiff Seaton was repeatedly informed by members of the Bard community of serious alleged misconduct by Bard employees. Plaintiff Seaton dutifully reported such allegations to high-level Bard administrators, but, to her knowledge, no investigation followed.

116.    From 2009 to 2019, all but one of Bard's seventeen vice-presidents were White and there were no people of color *at all* in high-level positions or in major admin meetings.

Case 7:22-cv-07258-CS   Document 45   Filed 01/04/23   Page 33 of 46

117.    At least four of Bard's White Vice-Presidents graduated from Bard themselves and have not worked anywhere other than Bard. In every case, these employees were promoted to the "Vice President track" without either a completed graduate degree or any external work experience.

118.    From 2009 to the beginning of 2018, no minority sat on Bard's Executive Committee, a committee that consisted of the chairs of each academic department.  This committee had final decision-making authority over the courses taught by faculty, which courses students could take, whether students could remain at the College, and whether students would be recommended for financial aid.

119.    The average tenure at Bard College for Black administrators, not including Plaintiff Seaton herself, is three years.

120.    The average tenure for White administrators in Vice President positions or higher is three decades.

121.    During the relevant period, the vast majority, if not all, of the employees in the Dean of Students office was White.

122.    During the relevant period, the vast majority, if not all, of the employees in the Dean of Studies office was White.

123.    The Bard College Faculty, as of 2022, is 95.7 percent non-underrepresented minorities; and only 4.39 percent underrepresented minorities.

124.    In July 2020, Bard belatedly hired a "Director of Inclusive Excellence," who left Bard after only two years in the post, acknowledged that microaggressions against people of color and implicit bias are common on Bard campus, and that Bard had never adopted a formal policy on racial and ethnicity-based harassment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of New York State Human Rights Law – Race, Color, Gender, and Sexual Orientation Discrimination**

125.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

126.    The New York Executive Law §296(1)(a) provides that, "It shall be an unlawful discriminatory practice: (a) For an employer or licensed agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse or hire or employ or to bar or to discharge from employment such individual in compensation or in terms, condition or privileges of employment."

127.    Plaintiff is a Black, female lesbian who was, at all times relevant herein, employed by Defendant Bard College.

128.    Defendant Bard College is an educational institution as defined by New York Executive Law §292(37).

129.    Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Defendant Bard College discriminated against Plaintiff by subjecting her to

different treatment on the basis of her race, color, gender, and sexual orientation;

- Plaintiff, an African American woman, was treated differently from other similarly situated employees of different races/ethnicities;

- Defendant Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Plaintiff to file a complaint against the College;

- As a result of discrimination, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status such as discharging, barring, refusing to transfer, failing to promote, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, and sexual orientation;

- Defendant Bard College subjected Plaintiff to harassment due to her race, color, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Plaintiff's race, color, gender, sexual orientation, and/or good faith complaints protected by the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a), were motivating factors in Defendant's decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ Plaintiff in any position, and/or to take other adverse job actions against Plaintiff.

130.    Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

131.     Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

132.     Under the New York State Human Rights Law, as a proximate result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

133.     Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

134.     Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

135.     Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

136.     Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles Plaintiff to punitive damages against Defendant.

### SECOND CAUSE OF ACTION

### Violation of New York State Human Rights Law - Retaliation

137.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

138.     The New York Executive Law §296(7) provides that, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to

retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

139.   Defendant Bard College is an educational institution as defined by New York Executive Law §292(37).

140.   Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(7);

- Retaliating against Plaintiff for seeking to exercise rights guaranteed under the New York State Human Rights Law, and/or Defendant's race, color, gender, and sexual orientation discrimination, opposing Defendant's failure to provide such rights, and/or the right to be free of discrimination, in violation of the New York State Human Rights Law § 296 (7);

- Defendant Bard College retaliated against Plaintiff because of her complaints of discrimination on the basis of her race, color, gender, and sexual orientation;

- Defendant Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Jane Doe to file a complaint against the College;

- Defendant Bard College subjected Plaintiff to harassment due to her race, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;

- Harassing Plaintiff and/or creating a hostile work environment in whole or in part

on the basis of Plaintiff's race, color, gender, sexual orientation and/or good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Plaintiff's race, color, gender, sexual orientation, and/or good faith complaints protected by the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a), were motivating factors in Defendant's decision to terminate Plaintiff's employment, not to retain, hire, or otherwise employ Plaintiff in any position, and/or to take other adverse job actions against Plaintiff;

- Defendant Bard College was deliberately indifferent to the risk that members of its staff harassed Plaintiff, retaliated against her, and subjected her to a hostile work environment.

141. Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

142. Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

143. Under the New York State Human Rights Law, as a proximate result of Defendant's unlawful conduct, plaintiff is entitled to compensatory damages in an amount according to proof.

144. Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has

FILED: DUTCHESS COUNTY CLERK 12/29/2022 06:05 PM
Case 7:22-cv-07258-CS Document 45 Filed 01/04/23 Page 39 of 46

sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

145.     Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

146.     Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

147.     Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendant.

## THIRD CAUSE OF ACTION

### Violation of New York State Human Rights Law — Hostile Work Environment Arising from Discrimination Based on Race, Color, Gender, and Sexual Orientation

148.     The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

149.     The New York State Human Rights Law prohibits employers from creating a hostile work environment arising from discrimination based on a Plaintiff's membership in a protected class.

150.     The New York Executive Law §296(1)(h) provides that, "It shall be an unlawful discriminatory practice for an employer to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or

expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, status as a victim of domestic violence, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims."

151.    Defendant's conduct, as alleged, violated the New York State Human Rights Law, including N.Y. Exec. Law § 296(1)(h).  Plaintiff was subjected to a hostile work environment because of her race, color, gender, and sexual orientation.

152.    Defendant's conduct, as alleged, violated the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296.  Defendant committed unlawful employment practices, including but not limited to, the following bases for liability:

- Taking adverse employment actions against the Plaintiff, such as discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or other good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);
- Bard College discriminated against Plaintiff because she opposed Bard College's discriminatory treatment of Black and female students and enabled Plaintiff to file a complaint against the College;
- Bard College subjected Plaintiff to harassment due to her race, color, gender, sexual orientation and because she opposed the harassment of students due to race, color, gender and sexual orientation;
- Harassing Plaintiff and/or creating a hostile work environment in whole or in part on the basis of Plaintiff's race, color, gender, sexual orientation and/or good faith complaints in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(h);

FILED: DUTCHESS COUNTY CLERK 12/29/2022 06:05 PM

- As a result of the hostile work environment, Plaintiff suffered a "tangible employment action" defined as a significant change in employment status such as discharging, barring, refusing to transfer, failing to promote, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, color, gender, and sexual orientation;

- Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on, Plaintiff's race, color, gender, sexual orientation, and other good faith complaints, and/or other protected characteristic or activity in violation of the New York State Human Rights Law, including but not limited to, N.Y. Exec. Law § 296(1)(a);

- Defendant Bard College was deliberately indifferent to the risk that members of its staff harassed Plaintiff, retaliated against her, and subjected her to a hostile work environment.

153.    Defendant Bard College failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of race, color, gender, and sexual orientation discrimination, including sexual assault, harassment, and retaliation, which caused Plaintiff to be harassed and made her more vulnerable to such harassment and subjected her to a hostile work environment.

154.    Plaintiff is entitled to all available compensation under the New York State Human Rights Law.

155.    Under the New York State Human Rights Law, as a proximate result of Defendant's unlawful conduct, plaintiff is entitled to compensatory damages in an amount according to proof.

156.    Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

157.    Under the New York State Human Rights Law, as a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has

suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

158. Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

159. Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendant.

## FOURTH CAUSE OF ACTION

### Defamation – Slander Per Se

160. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

161. Following Plaintiff's suspension on August 16, 2019, Defendant Bard College made, and continues to make, false statements about Plaintiff to prospective employers, members of the Bard community and Bard alumni. Plaintiff is informed and believes that these false statements related to Plaintiff's competence as a teacher and false statements about the nature of the sham investigation Defendant undertook against her. Plaintiff is informed and believes that these false statements were made with malice and an intent to injury Plaintiff in her profession and prevent her from getting alternative employment.

162. After the initial complaint in this matter was filed, President of Bard College Leon Botstein made the following four defamatory and false statements to members of the Bard Alumni Board of Governors: (1) that Plaintiff had been terminated after a Title IX investigation; (2) that the federal Judge in this case, had already "declared the case to be outrageous and without merit;"

(3) that the lawsuit's "accusations are baseless;" and that Plaintiff had left a "trail of difficulty, and anger and disappointment" when she was terminated from Bard.

163.     Defendant Bard College knew or should have known, when making each of these statements, that they were false. No Title IX complaint was ever submitted to Bard regarding Plaintiff nor a Title IX investigation conducted.

164.     Defendant Bard College made these statements without reasonable care as to the truth or falsity of the statements, and with the intention of causing injury to Plaintiff's reputation in her profession.

165.     Defendant Bard College's defamatory statements were not protected by any privilege.

166.     As a result of Defendant Bard College's false statements, Plaintiff has suffered injury to her personal, social, and professional reputation.

167.     As a proximate result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages in an amount according to proof.

168.     As a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits in an amount according to proof.

169.     As a proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to her damage in a sum according to proof.

170.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

171.    Defendant's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles plaintiff to punitive damages against Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Ann Seaton, respectfully requests that this Court grant the following relief against Defendant:

a.    For an award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and economic damages;

b.    For an award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and compensatory damages, including compensation for Plaintiff's emotional distress;

c.    For compensatory damages according to proof;

d.    For general and special damages according to proof;

e.    For exemplary damages according to proof;

f.    For pre-judgment and post-judgment interest on all damages awarded;

g.    For reasonable attorneys' fees;

h.    For costs of suit incurred;

i.    For an award of lost wages in an amount to be determined at trial;

j.    For an award of punitive damages in an amount to be determined at trial;

k.    For an award of pre-judgment interest on all amounts due;

l.    For such other and further relief as the Court may deem just and proper.

Dated: December 29, 2022.                          Respectfully Submitted,

STRATEGIC ADVOCACY CLINIC
YALE LAW SCHOOL*

By:

Avery Gilbert
127 Wall St.
New Haven, CT 06511
(203) 432-2198
Email: avery.gilbert@yale.edu

**LAW OFFICE OF AVERY P. GILBERT**
Avery Gilbert
Zachary Bendiner
15 Shatzell Avenue
Suite 232
Rhinecliff, NY 12574
(845) 380-6265
Email: avery@agilbertlaw.com
Email: zbendiner@agilbertlaw.com

**California Civil Rights Law Group**
Lawrence Organ (Pro Hac Vice)
Zarrina Ozari
Kira Brekke (Pro Hac Vice)
332 San Anselmo Avenue
San Anselmo, CA 94960
(415) 453-4740
Email: larry@civilrightsca.com
Email: zarrina@civilrightsca.com
Email: kira@civilrightsca.com

*Attorneys for Plaintiff*

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 29, 2022

Respectfully Submitted,

**STRATEGIC ADVOCACY CLINIC**
**YALE LAW SCHOOL\***

By:

Avery Gilbert
127 Wall St.
New Haven, CT 06511
(203) 432-2198
Email: avery.gilbert@yale.edu

INDEX NO. 2022-54149
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 12/29/2022

**LAW OFFICE OF AVERY P. GILBERT**
Avery Gilbert
Zachary Bendiner
15 Shatzell Avenue
Suite 232
Rhinecliff, NY 12574
(845) 380-6265
Email: avery@agilbertlaw.com
Email: zbendiner@agilbertlaw.com

**California Civil Rights Law Group**
Lawrence Organ (Pro Hac Vice)
Zarrina Ozari
Kira Brekke (Pro Hac Vice)
332 San Anselmo Avenue
San Anselmo, CA 94960
(415) 453-4740
Email: larry@civilrightsca.com
Email: zarrina@civilrightsca.com
Email: kira@civilrightsca.com

*Attorneys for Plaintiff*

*This document has been prepared by a clinic operated by Yale Law School, but does not purport to present the school's institutional views, if any.